John GARD, friends and neighbors of John Gard, David T. Prosser, Gregg Underheim, Republican Party of Marinette County, Republican Party of Oconto County, and Republican Assembly Campaign Committee, Petitioners,

v.

Wisconsin STATE ELECTIONS BOARD, Respondent,

COMMON CAUSE IN WISCONSIN, Wisconsin League of Women Voters, David Travis, Friends of David Travis, Thomas Loftus, The Democratic Party of Dane County and the Assembly Democratic Campaign Committee, Intervening-Respondents.

Supreme Court

*No. 90-0298-OA. Argued May 30, 1990.—Decided June 27, 1990.*

(Also reported in 456 N.W.2d 809.)

28

For the petitioners there were briefs by *Robert M. Whitney, Peter F. Krug* and *Foley & Lardner,* Madison and oral argument by *Mr. Whitney.*

For the respondent the cause was argued by *Alan Lee,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

For the intervening-respondents there was a brief by *Jeffrey J. Kassel, Brady C. Williamson* and *LaFollette & Sinykin,* Madison and oral argument by *Mr. Williamson.*

HEFFERNAN, CHIEF JUSTICE. This is an original action brought by the petitioners pursuant to sec. 809.70, Stats., for a declaratory judgment seeking a declaration of the constitutionality of sec. 11.26(9)(a), Stats.,[1] of Wisconsin's campaign financing law, which establishes an absolute dollar cap on the amount of funding, in the aggregate, a candidate may receive from all committees, including PACs (political action committees), political party committees and legislative campaign committees ("party-related committees").[2] We

---

[1]Section 11.26(9)(a), Stats., provides:

No individual who is a candidate for state or local office may receive and accept more than 65% of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees subject to a filing requirement, including political party and legislative campaign committees.

Section 11.31(1), Stats., sets forth a schedule of disbursement levels which operate as spending limits if a candidate accepts public financing. In addition, the disbursement levels provide a reference point for setting contribution limits such as in sec. 11.26(9), Stats. The disbursement level during the 1987 special election for an assembly candidate was $17,250 total in the primary and election, with disbursements not to exceed $10,775 for either the primary or the election. Section 11.31(1)(f), Stats.

[2]"Committee" and "political committee" are defined in sec. 11.01(4), Stats., as "any person other than an individual and any combination of 2 or more persons, permanent or temporary,

conclude that sec. 11.26(9)(a), Stats., is constitutional.

Petitioner, John Gard, is the Representative to the Wisconsin State Assembly from the 88th Assembly District. Gard was first elected to that seat in an October 6, 1987 special election and was re-elected in a general election held on November 7, 1988. "Friends and Neighbors of John Gard" is Representative Gard's registered campaign committee. Petitioners, David T. Prosser and Gregg Underheim, are Representatives to the Wisconsin State Assembly from the 57th and 54th Assembly Districts, respectively. Petitioners, Republican Party of Marinette County and Republican Party of Oconto County, are political party committees and Petitioner,

which makes or accepts contributions or makes disbursements, whether or not engaged in activities which are exclusively political, except that a 'committee' does not include a political 'group' under this chapter."

Political party committees are statewide political organizations registered under sec. 11.05, Stats., such as the Republican Party of Wisconsin or the Democratic Party of Wisconsin. Section 5.02(13), Stats.

Legislative campaign committees are established by the members of each political party in each house of the Wisconsin Legislature. Section 11.265, Stats. There are currently four legislative campaign committees in Wisconsin: the Assembly Democratic Campaign Committee, the Republican Assembly Campaign Committee, the State Senate Democratic Committee, and the Committee to Elect a Republican Senate. *See* Shea, *Legislative Campaign Committees: The Wisconsin Experience* (1986) (available at Wisconsin Legislative Reference Bureau). *See also* 1989 Wis L. Rev. 1467, n.8.

The term "committee" includes all committees. We use the term "party-related committees" to refer to legislative campaign committees and political party committees and "PAC" to refer to all other committees.

.

34

Republican Assembly Campaign Committee, is a legislative campaign committee.

This case arises out of the Wisconsin State Elections Board[3] complaint against Representative Gard and his campaign committee alleging a violation of sec. 11.26(9)(a), Stats. *State of Wisconsin Elections Board v. John Gard and Friends and Neighbors of John Gard,* Case No. 89-CV-219, Oconto County Circuit Court. That complaint states that pursuant to secs. 11.26(9)(a) and 11.31(1), Stats., 1987, the limit on contributions that an assembly candidate could receive and accept during the November, 1987 special election campaign, from all committees combined including party-related committees, was $11,213. During the 1987 special election campaign in the 88th Assembly District, John Gard and his campaign committee received and accepted $18,820.32 from committees, thus exceeding the limit imposed by sec. 11.26(9)(a) by $7,607.32. The Board sought a $500 forfeiture pursuant to sec. 11.60(1), Stats., for the violation.

On February 13, 1990, Petitioners filed a Petition for Leave to Commence an Original Action in the Wisconsin Supreme Court seeking a declaration from this court on the constitutionality of sec. 11.26(9)(a), Stats. This court granted the petition on February 20, 1990, and ordered that the proceedings in Case No. 89-CV-219, pending in Oconto County Circuit Court be stayed pending further order of this court. Leave to intervene was granted to various groups and individuals.[4]

---

[3]The Wisconsin State Elections Board, "Respondent", is the administrative agency charged with enforcing Wisconsin's Campaign Financing Law. Section 5.05, Stats.

[4]Common Cause in Wisconsin, Wisconsin League of Women Voters, Inc., David Travis, Friends of Dave Travis, Thomas Lof-

Petitioners assert that sec. 11.26(9)(a), Stats., is unconstitutional on several grounds. First, they claim that the aggregate limit on the amount of money committees may contribute to a candidate's campaign violates committee members' first amendment rights to political expression because it completely bars some committees from making even a symbolic expression of support evidenced by a contribution once the aggregate limit has been reached. Second, they argue that the aggregate limit on committee contributions is, in effect, a limit on the candidate's ability to spend, which impermissibly burdens a candidate's freedom of speech guaranteed by the first amendment under *Buckley v. Valeo,* 424 U.S. 1 (1976). Third, they assert that the statute impermissibly burdens freedom of association also guaranteed by the first amendment by encouraging individuals to disassociate themselves from committees. Fourth, petitioners argue that the statute imposes a greater burden on the first amendment rights of committees than it does on the first amendment rights of individuals in violation of the equal protection clauses of the United States and Wisconsin Constitutions. Petitioners also assert that the statute imposes a greater burden on the first amendment rights of committees who contribute "late" in a campaign than on committees who contribute "early" in a campaign in violation of equal protection guarantees.

We find none of these arguments warrant holding that the questioned subsection of Wisconsin's Campaign Financing Law is unconstitutional. We conclude that there is a compelling state interest which justifies placing marginal restrictions on first and fourteenth amendment rights. Furthermore, we conclude that the Wiscon-

tus, The Democratic Party of Dane County, and The Assembly Democratic Campaign Committee.

sin legislature has narrowly tailored its aggregate contribution limit to accomplish its achieved end—the prevention of either actual or potential corruption.

Wisconsin has a long tradition of ensuring a government free from corruption.[5] In the early 1970's, in the wake of the "Watergate" affair, Wisconsin, along with several other states and Congress, introduced significant campaign finance reform legislation in an effort to purify the political process. *Campaign Finance Reform,* Research Bulletin 74-RB-1 p. 1, (available at the Wisconsin Legislative Reference Bureau). In 1973 Governor Patrick Lucey asked Professor David Adamany, a University of Wisconsin professor of political science, to chair a committee to conduct a study of campaign financing in Wisconsin. *Id.* at 14. The committee issued a tentative draft in October 1973, setting forth a preliminary proposal for comprehensive reform of Wisconsin's campaign financing law. *Id.* at 14.

The committee's findings were published in final form in March, 1974. *Governor's Study Committee on Political Finance: Final Report.* In his 105-page report, Professor Adamany explained that the then current Wisconsin law, the Wisconsin Corrupt Practices Act, enacted in 1911, was inadequate to curb corruption in campaign financing. *Id.* at 34. In response to the archaic and unrealistic limits on the amount of money candidates could spend on their campaigns for political offices set by the Corrupt Practices Act, candidates had set up "voluntary committees" which basically were unaffected by campaign financing legislation. *Id.* In addition, the

---

[5]For a history of campaign financing regulation in Wisconsin, along with a discussion suggesting the aggregate limit on committee contributions is unconstitutional see Comment, *Campaign Finance in Wisconsin After Buckley,* 1976 Wis. L. Rev. 816, 855.

law contained absolutely no limitations on the amount of money individuals or groups could contribute to an individual candidate or to all candidates. *Id.* at 36. Furthermore, Professor Adamany advised that the numerous defects in Wisconsin's law were compounded by the near absence of enforcement of the law. *Id.* at 45.

Professor Adamany and the committee recognized that the problem with campaign financing in Wisconsin was not that candidates were spending too much money. In fact, Professor Adamany emphasized that "[r]eform legislation must acknowledge the need to spend money for vigorous campaigning." *Id.* at 50. Instead, he surmised the problem with campaign financing to be that the funds available for financing campaigns were not made available from a large and representative contributor pool. Professor Adamany recommended five areas of reform: (1) expenditure limits on the amount candidates could spend when receiving public financing; (2) contribution limits on the amount an individual, political party, and special interests could contribute to an individual candidate and all candidates; (3) full disclosure of all financial transactions of campaign financing required; (4) establishment of a bipartisan enforcement commission; and (5) availability of public financing to insure clean money from a representative source for candidates. *Id.* at 50–52.

In response, Governor Lucey called the Wisconsin legislature into a special session to reform the campaign financing laws. Shortly thereafter, Governor Lucey signed into law Special Session Senate Bill 5, creating what is now Chapter 11 of the Wisconsin Statutes. Laws of 1973, Ch. 334 (published July 6, 1974). Section 11.001, Stats., provides the following declaration of policy:

> **11.001  Declaration of policy. (1)** The legislature finds and declares that our democratic system of

government can be maintained only if the electorate is informed. It further finds that excessive spending on campaigns for public office jeopardizes the integrity of elections. It is desirable to encourage the broadest possible participation in financing campaigns by all citizens of the state, and to enable candidates to have an equal opportunity to present their programs to the voters. One of the most important sources of information to the voters is available through the campaign finance reporting system. Campaign reports provide information which aids the public in fully understanding the public positions taken by a candidate or political organization. When the true source of support or extent of support is not fully disclosed, or when a candidate becomes overly dependent upon large private contributors, the democratic process is subjected to a potential corrupting influence. The legislature therefore finds that the state has a compelling interest in designing a system for fully disclosing contributions and disbursements made on behalf of every candidate for public office, and in placing reasonable limitations on such activities. Such a system must make readily available to the voters complete information as to who is supporting or opposing which candidate or cause and to what extent, whether directly or indirectly. This chapter is intended to serve the public purpose of stimulating vigorous campaigns on a fair and equal basis and to provide for a better informed electorate.

Section 11.26(9)(a), Stats., is but one subsection in a comprehensive legislative scheme to reform campaign financing in Wisconsin. To evaluate the constitutional implications of sec. 11.26(9)(a), Stats., we must review it in the context of the entire Campaign Financing Act.[6]

---

[6]For a recent discussion of Wisconsin's aggregate limit on committee contributions to candidates see Comment, *The Best*

One of the most important areas of campaign finance regulation is a restriction on the source and size of campaign contributions. In Wisconsin, candidates may accept money from four sources: their own resources, other individuals, public financing, and committees. Corporations are prohibited from making direct or indirect contributions to candidates, but may establish separate segregated funds, commonly known as PACs, for the purpose of administering contributions from individuals. Sections 11.38(1)(a)1 and 2. Candidates may make unlimited contributions of their own funds to their own campaigns. Section 11.26(5), Stats. Limits are placed on the amounts which an individual may contribute to specific candidates, which varies with the office sought, and a $10,000 limit is placed on the total contributions an individual may make to all candidates and committees combined in a calendar year. Sections 11.26(1) and (4). If candidates accept public financing, limits are set on the total amount of money they may spend on their campaign. Section 11.31(2), Stats. Depending on the type of committee, limits are set on the amounts committees may contribute and receive.

The Campaign Finance Law creates essentially two classes of committees. An individual committee other than a political party committee or legislative campaign committee is what is commonly referred to as a PAC or special interest group. Limits are set on the amounts an individual committee, other than a political party committee or legislative campaign committee, may contribute to each candidate, depending upon the political office sought. Section 11.26(2), Stats. For example, in the 1987 Special Election, an individual PAC could contribute no more than $500 to an assembly candidate. Section

*Laid Schemes of Mice and Men: Campaign Finance Reform Gone Awry,* 1989 Wis. L. Rev. 1465.

11.26(2)(c). The limits in sec. 11.26(2) apply only to PACs and not to political party committees and legislative campaign committees (party-related committees). Total contributions by each PAC to a party-related committee are also limited to $6,000 per year. Sections 11.26(8)(c) and 11.265(2). In addition to the limits on individual PAC contributions to party-related committees, no party-related committee can receive over $150,000 from all PACs in a biennium. Sections 11.26(8)(a) and 11.265(2). These limits on committee contributions to other committees do not apply to transfers between party-related committees.

Section 11.26(9)(a), Stats., however, places a restriction on party-related committees by limiting the total amount of money a candidate may accept from all committees combined. The cap in sec. 11.26(9)(a) is set at 65 percent of the total disbursement level in sec. 11.31, Stats., which is the schedule of maximum disbursement levels for various political offices if public financing is accepted. Furthermore, sec. 11.26(9)(b) limits the total amount of money a candidate may accept from all PACs combined to 45 percent of the disbursement level.[7] Thus, while a candidate may accept up to 65 percent of the fixed disbursement level in sec. 11.31, from all committees, a candidate may accept only 45 percent of that amount from PACs.

To illustrate, during the November, 1987 special election campaign, the total disbursement level for a

---

[7]Section 11.26(9)(b), Stats., provides:

No individual who is a candidate for state or local office may receive and accept more than 45% of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees other than political party and legislative campaign committees subject to a filing requirement.

candidate for representative to the assembly was $17,250. Section 11.31(1)(f), Stats. The limit on contributions that an assembly candidate could receive and accept from all committees combined was $11,213 or 65 percent of $17,250. Of that total, no more than $7,763 or 45 percent of the total disbursement level, could be received and accepted by an assembly candidate from all PACs. Furthermore, each PAC was limited in the amount it could contribute to an assembly candidate to $500. Section 11.26(2)(c), Stats. Thus, candidates have the discretion to accept funds from these different committees in any amounts they choose, so long as they abide by the 65 percent limit for all committees and the 45 percent limit on PACs. For example, an assembly candidate could have accepted all of the $11,213 from party-related committees or could have accepted $7,763 (45 percent) from PACs and the remaining $3,450 (20 percent) from party-related committees. In any event 20 percent of the candidate's disbursement level is reserved for party-related committees.

Representative Gard allegedly violated the aggregate limit for all committees set by sec. 11.26(9)(a), Stats., and not the aggregate limit on contributions from PACs under sec. 11.26(9)(b) because he received less than $7,763 (45 percent limit) in contributions from PACs, but more than $11,213 (65 percent limit) from PACs and party-related committees combined.[8]

In addition to restrictions on the source and size of campaign contributions, there are a number of other reform measures in Wisconsin's Campaign Finance Law. All committees, candidates, and corporations which establish PACs are subject to registration and reporting requirements, including itemization of all contributors

[8]Biennial Report of the Wisconsin State Elections Board (December 1989), p. I–178.

who have made contributions in excess of $20. Section 11.06. *See also* secs. 11.05, and 11.38(1)(a)2, Stats. Compliance with the Campaign Financing Law is encouraged by vigorous enforcement, including imposition of civil or criminal penalties for violations of its provisions. Sections 11.60 and 11.61, Stats.

The regulation of political campaigns involves a careful balancing of two competing interests. Legislators are placed in the difficult position of trying to regulate political activity while at the same time allowing the political process to work free from government interference. "The area of campaign finance is unique because, in the campaign context, 'both the first amendment and the law with which it is in potential conflict are designed to accomplish the same broad purpose, namely to advance the interests of democratic self-government.' " Nahra, *Political Parties and the Campaign Finance Laws: Dilemmas, Concerns and Opportunities,* 56 Fordham L. Rev. 53, 59 (1987).[9]

■ We begin our discussion by setting forth some general principles from *Buckley v. Valeo,* 424 U.S. 1 (1976), the landmark Supreme Court decision which evaluated the constitutionality of several provisions of the Federal Election Campaign Act of 1971 (FECA), and from *Buckley'* s progeny. Limitations upon the giving and spending of money in political campaigns "operate in an area of the most fundamental First Amendment activities." 424 U.S. at 14. Restrictions on campaign contributions and expenditures implicate both the rights of political

---

[9]*See also* Wright, *Politics and the Constitution: Is Money Speech?,* 85 Yale L.J. 1001, 1005–06 (1976); L. Tribe, *American Constitutional Law* sec. 13–27 (1978); and Cox, *The Supreme Court, 1979 Term-Foreword: Freedom of Expression in the Burger Court,* 94 Harv. L. Rev. 1, 70 (1980).

expression and association protected by the first amendment. *Id.* at 14 and 15. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Id.* A major purpose of the first amendment was to protect the free discussion of governmental affairs, including discussions about candidates. *Id.*

Because campaign financing regulations burden first amendment rights of free speech and association, they can only survive strict scrutiny if it is shown that they serve a compelling governmental interest and that the regulations are narrowly tailored. *Buckley,* 424 U.S. at 44–45; *Austin v. Michigan Chamber of Commerce,* — U.S. —, 110 S.Ct. 1391, 1396 (1990). In *Buckley,* the Court emphasized, however, that " '[n]either the right to associate nor the right to participate in political activities is absolute' " and that even a " ' "significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of" first amendment rights. *Id.* at 25. In *Buckley,* the Court recognized that there is a compelling state interest in regulating campaign financing to prevent either actual corruption or the appearance of corruption "stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id.* at 27. *See also FEC v. National Conservative PAC,* 470 U.S. 480, 496–97 (1985), "We held in *Buckley* and reaffirmed in *Citizens Against Rent Control* that preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." Moreover,

the *Buckley* Court recognized that restrictions on contributions to political campaigns pose a lesser threat to the first amendment than do restrictions on expenditures.[10] The *Buckley* court struck down as unconstitutional limitations on independent expenditures and upheld as constitutional limitations on contributions to candidates. The Court stated:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached . . ..

> The expenditure limitations contained in the Act represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech . . ..

> By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate

---

[10]The distinction between contributions or "speech by proxy" and expenditures has many critics, including members of the Court. *Buckley,* 424 U.S. at 244 (Burger, C.J., concurring in part and dissenting in part); *Id.* at 261 (White, J., concurring in part and dissenting in part); *Id.* at 290 (Blackmun, J., concurring in part and dissenting in part); *Federal Election Comm. v. National Conservative Political Action Com.,* 470 U.S. 480, 519 (1985) (Marshall, J., dissenting); *Austin v. Michigan Chamber of Commerce,* — U.S. —, 110 S.Ct. 1391, 1407 (1990) (Stevens, J., concurring); Powe, *Mass Speech and the Newer First Amendment,* 1982 Sup. Ct. Rev. 243, 258–259.

and his views, but does not communicate the under-
lying basis for the support. The quantity of commu-
nication by the contributor does not increase percep-
tibly with the size of his contribution, since the
expression rests solely on the undifferentiated, sym-
bolic act of contributing. At most, the size of the
contribution provides a very rough index of the
intensity of the contributor's support for the candi-
date. [Footnote omitted.] A limitation on the amount
of money a person may give to a candidate or cam-
paign organization thus involves little direct restraint
on his political communication, for it permits the
symbolic expression of support evidenced by a contri-
bution but does not in any way infringe the contribu-
tor's freedom to discuss candidates and issues. While
contributions may result in political expression if
spent by a candidate or an association to present
views to the voters, the transformation of contribu-
tions into political debate involves speech by some-
one other than the contributor.

424 U.S. at 19-21.

*See also California Medical Assn. v. FEC,* 453 U.S. 182,
196 (1981).

It is subsection (a) of 11.26(9), Stats., which places a
cap on the total amount of contributions a candidate
may accept from all committees, including party-related
committees and PACs, which the petitioners challenge.
We conclude that sec. 11.26(9)(a) which restricts com-
mittee contributions to a candidate's campaign, burdens
the first amendment rights to free speech and associa-
tion of those committees and, therefore, is subject to
strict judicial scrutiny. The statute will pass constitu-
tional muster only if this court concludes that it is justi-
fied by the compelling state interest of preventing cor-

46

ruption or the appearance of corruption and if it is narrowly tailored to accomplish that end.

Respondents claim that sec. 11.26(9)(a), Stats., is a contribution limit, not an expenditure limit, and that restrictions on contributions require less compelling justification than restrictions on independent spending. *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 259–260 (1986). Petitioners, on the other hand, argue that sec. 11.26(9)(a) is an expenditure limit because it limits the amount of money a candidate can spend from a particular source—committees. Petitioners argue that all aggregate contribution limits have the effect of limiting a candidate's spending by placing an absolute ceiling on the amount a candidate may receive from a source.[11] Petitioners assert that aggregate limits on committee contributions are different than aggregate limits on individual contributions, which were upheld in *Buckley.* The aggregate limit on committees places a cap on *all* committees, so that a candidate cannot receive any additional contributions from committees, even from those which have not contributed to the candidate's campaign or any other candidate's campaign. This is unlike the aggregate limit on individuals because, once a candidate has received the maximum amount allowed from a particular individual, that candidate may seek a contribution from the "next" individual. Petitioners claim that by placing an aggregate cap on committee

[11]Petitioners challenge only sec. 11.26(9)(a), Stats., and they claim that it is possible for this court to narrowly rule that sec. 11.26(9)(a) is unconstitutional, whereas the aggregate limit on PAC contributions in sec. 11.26(9)(b) may be upheld as constitutional. We disagree with this assertion. The same constitutional problems are implicated in both secs. 11.26(9)(a) and (b) because both place aggregate limits on contributions from a particular source.

contributions, sec. 11.26(9)(a), Stats., prohibits candidates from seeking a contribution from the "next" committee. Put another way, sec. 11.26(9)(a) places a limit on the amount a candidate may receive, which by implication places a limit on the amount a candidate may spend.[12]

The United States Supreme Court has recognized that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley,* 424 at 21. In upholding FECA's contribution limits, the Court noted that "[t]he overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression." *Id.* at 21–22.

We disagree with Petitioners that, by limiting the amount of money that a candidate can accept from committees, the legislature is placing a limit on the amount of money that a candidate can spend. After a candidate has received the amount of money allowed by the aggregate limit from committees, the candidate can still receive an unlimited amount of money from other individuals, from their own sources, and from individuals through other sources such as conduits.[13] *See* infra at 33.

---

[12]Candidates may not spend more than they can receive. Sections 11.14(1) and 11.16(1), Stats.

[13]In this respect, Wisconsin's aggregate contribution limit imposes significantly less restrictions on a candidate's ability to raise funds than the total ban on contributions during legislative

Therefore, we conclude that sec. 11.26(9)(a), Stats., is a limit on the amount of money committees can contribute to a candidate and not a limit on the amount of money a candidate may spend and therefore is only a marginal restriction on speech.

This conclusion is supported by the legislative history of Wisconsin's Campaign Finance Law. The reformers of campaign financing were not concerned that candidates were spending too much money and, in fact, recognized that candidates needed to spend a considerable amount of money in order to have an effective campaign. The reformers were concerned, however, with large concentrations of money from an unrepresentative pool of contributors which would have a corrupting influence on candidates. *Governor's Study Committee on Political Finance: Final Report,* p. 49.

Respondents also argue that this court should defer to the legislative determination of where the balance should be struck between regulation of campaign financing and the first amendment.[14] They rely on the United States Supreme Court decision in *FEC v. National Right to Work Committee,* 459 U.S. 197, 210 (1982), *("NRWC"),* in which Justice Rehnquist delivered the opinion for a unanimous court. In *NRWC,* the Court deferred to the legislative judgment that the special char-

---

session from any source struck down recently by the Florida Supreme Court in *State v. Dodd,* Filed May 8, 1990, 1990 Fla. LEXIS 667.

[14]See BeVier, *Money and Politics: A Perspective on the First Amendment and Campaign Finance Reform,* 73 Cal. L. Rev. 1045, 1069 (1985) for a critique of the concept of deference to the legislative determination of where the balance between the first amendment and regulation of campaign financing should be struck.

acteristics of the corporate structure require particularly careful regulation. The Court stated,

> While sec. 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the *potential* for such influence that demands regulation. Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared. (Emphasis added.)

The Court afforded less deference to the legislature, however, in *FEC v. National Conservative PAC,* 470 U.S. 480, 500–501 (1985), where Justice Rehnquist wrote for a majority of the court and announced that "when the First Amendment is involved, our standard of review is 'rigorous.' " Recently, in *Austin,* the Court once again deferred to the legislative determination that a particular type of political expenditure—immense aggregations of wealth accumulated through the corporate form—undermines the integrity of the political process.

We conclude, however, that where the first amendment is involved we cannot blindly defer to the legislative determination of where the constitutional balance should be struck. "To the extent that the Government suggests that we should defer to Congress' conclusion about an issue of constitutional law, our answer is that while we do not ignore it, it is our task in the end to decide whether Congress has violated the Constitution." *Sable Communications of California, Inc. v. F.C.C.,* — U.S. —, 109 S.Ct. 2829, 2838 (1989). Therefore we independently review the legislative determinations that sec. 11.26(9)(a), Stats., was necessary to prevent corruption or the appearance of corruption and that it was the least

restrictive means of achieving that legislative goal. We emphasize that we are reviewing the legislative decision to place an aggregate limit on contributions from a particular source and not the legislative decision of where to place that limit, i.e. 65 percent.

In *Buckley,* the court looked at a number of documented abuses to provide support for the conclusion that the legislative determination was correct.[15]

> Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.

424 U.S. at 27.

Likewise, this court will look to materials from the Wisconsin Legislative Reference Bureau and State Elections Board, of which we properly may take judicial notice, *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 504, 261 N.W.2d 434 (1978), in determining whether the legislative enactment violates constitutional protections.

First we address whether there is a compelling state interest in limiting aggregate committee contributions. Here the Wisconsin legislature has determined that large committee contributions to individual candidates, either directly or through party-related committees, will undermine the integrity of the political process. The Respondents state two reasons why the aggregate contribution limit is necessary in order to prevent large committee contributions from corrupting the political system. The Respondents maintain that the aggregate limit is neces-

[15]The Supreme Court opinion, 424 U.S. at 27, n.28, noted with approval that part of the Court of Appeals' decision in *Buckley v. Valeo,* 519 F.2d 821, 839–840 (D.C. Cir. 1975), which discussed campaign finance abuses as revealed by a myriad of sources from opinion polls to Congressional Reports.

sary to prevent PACs from circumventing the other contribution limits by passing money through party-related committees and, therefore, is directly related to the restrictions on the amount of money any individual committee may contribute to any individual candidate. In addition, they claim that the aggregate limits, together with other existing limits on PAC contributions, are essential in order to prevent undue influence of special interests on an individual candidate's campaign. We find that these arguments are supported by the facts revealed by legislative history and by examining the reports of the Wisconsin State Elections Board.

Our inquiry begins with the legislative history of Wisconsin's Campaign Financing Law. As mentioned above, limitations on contributions to candidate's campaigns are but one aspect of comprehensive legislation passed by the Wisconsin legislature in 1974. The impetus for this legislation was the findings of Governor Lucey's Study Committee on Political Finance, chaired by Professor Adamany. *Governor's Study Committee on Political Finance: Final Report.*

In this report, the committee explained why limitations should be set on the amount of money candidates could receive from associations and political committees. The committee recognized that committees play an important role in Wisconsin politics and that constitutional protections on freedom of association required that committees be allowed to participate in campaign contributing. Nevertheless, the study committee was concerned that committees would circumvent contribution limits. The committee was particularly concerned with the ability of special interest PACs to "launder" money through the political parties.[16] The report warned

---

[16]*Id.* at 37–38. "Laundering" money, or passing money

that restrictions on special interest committees must be tightly drawn.

> Contribution limits should prevent large gifts and special interest gifts from dominating politics. Not only should an individual's contributions to particular campaigns and party committees be limited, his total political gifts in each calendar year should be restricted. Further, both individuals and special interests should be prevented from circumventing contribution limits through multiple committee giving and laundering. Restrictions must, necessarily, be tightly drawn to forestall such evasions.

*Id.* at 50.

Therefore, the committee recommended that a 25 percent contribution limit be set on the amount of money, in the aggregate, a candidate could receive from all committees combined. *Id.* at 73–74. The Report stated:

> The limit is imposed on the candidate. He is allowed to accept only 25 per cent of his expenditure limits from associations and political committees. He will select which groups he receives support from and in what amounts, but the aggregate of his support from such sources has a plainly defined ceiling. As California Assembly Speaker Jess Unruh once quipped, "He may sell shares in himself, but no one can buy a controlling interest."

*Id.* at 74.

The committee emphasized that the aggregate limit did not prevent committees from collecting and forwarding contributions to the candidate in the name of an individ-

---

through an entity or person to conceal its true origin, is prohibited by sec. 11.30(1), Stats.

ual, nor did it prohibit committees from making certain independent expenditures on behalf of the candidate. *Id.*

The concerns expressed in the Committee's Final Report were echoed in the drafting notes accompanying the passage of Wisconsin's aggregate limit on committee contributions by the Wisconsin legislature. In a memorandum entitled, "The Problems Inherent in Partially Limiting the Amount Special Interest Groups can Contribute," Senator William Bablitch, Senate Majority Leader, explained why limiting the amount each special interest group could contribute to a candidate was insufficient to accomplish the legislative goal of limiting the tremendous impact of special interests on individual campaigns. (Legislative Reference Bureau Drafting file—1973 Laws, Ch. 334.) Senator Bablitch explained that a single special interest group could proliferate into many, thereby evading the individual contribution limits. In addition, he warned that special interest groups could evade the contribution limits by contributing to the major political parties "with a tacit understanding of which candidate is going to receive [the contribution]." To prevent such corruption, he recommended that an aggregate limit be set on all committee contributions to a particular candidate. The legislature placed that limit at 65 percent, not 25 percent as recommended by Professor Adamany. Section 11.26(9), Stats.

Since it was originally passed in 1974, this subsection has remained substantively intact. In 1977, the legislature renumbered the provision as sec. 11.26(9)(a) and added sec. 11.26(9)(b), Stats., which placed an aggregate limit on the contributions a candidate could receive from all PACs. 1977 Wis. Laws, ch. 107, secs. 30, 31. And in 1986, the legislature added contributions from legislative campaign committees to candidates to the 65 percent

54

aggregate limit on all committee contributions set forth in sec. 11.26(9)(a). 1985 Act 303, sec. 51.

While Wisconsin's aggregate limit on committee contributions is somewhat novel, it is not an aberration. Five other states have subsequently adopted similar provisions, and Congress is currently considering proposed legislation which is similar to Wisconsin's.[17] The proposed federal legislation is aimed at the same evil as is sec. 11.26(9), Stats.,—to prevent PACs from having undue influence on any one candidate by circumventing the individual contribution limits through proliferation of committees or by channeling contributions through party-related committees. Report of the Committee on Rules and Administration, S. Rep. 101-253, 101st Cong., 2d Sess. (1990).

The findings of this Congressional Committee confirm the Wisconsin legislature's concern that without effective aggregate contribution limits, narrow interest groups have a corrupting influence on individual candidates. The Committee found that there was an enormous growth in the campaign financing role played by PACs and an increasing dependence by candidates upon such money.

> The Committee is concerned with the impact of such an increase in reliance on these [PAC] funds on the campaign finance system. The ability of political committees having similar interests to join together and make large contributions tends to undermine the effectiveness and integrity of the present system of limits on contributions. It believes that the imposi-

---

[17]See Haw. Rev. Stat. sec. 11-205 (1985); Mont. Code Ann. sec. 13-37-218 (1989); Ariz. Rev. Stat. Ann. sec. 16-905.C (1989); La. Rev. Stat. Ann. sec. 18:1505.2H(7) (1990); Cal. Gov't Code sec. 85305 (1990). See also S. 197, 101st Cong., 2d Sess.,—Cong. Rec.—(Mar. 21, 1990).

tion of a ceiling on *aggregate contributions* from such committees would restore the integrity and effectiveness of the existing and constitutionally sound limits on contributions by any single such political committee, person or other individual to a candidate.

*Id.* at 16. (Emphasis supplied.)

Even the Committee's minority report states that large contributions from groups with a narrow special interest bias can have the "unacceptable appearance of legislative 'quid pro quos.' " *Id.* at 74.

A dramatic increase in PAC contributions and influence on individual candidates has also taken place at the state level. In Wisconsin, PAC contributions to state candidates rose by over 50 percent in just four years. *See* Wisconsin State Elections Board, Report on Campaign Activity for 1987–88 and Summary released February 26, 1990. More significant, however, is the potential impact of narrow interest PAC money, which is channeled through party-related committees, on an individual candidate. *See NRWC,* 459 U.S. at 210 (1982).

To illustrate the potential impact of large PAC contributions on individual candidates and, therefore, the need for sec. 11.26(9)(a), Stats., in order to prevent domination of an individual candidate by narrow interest PAC money, we need only look at some statistics from the State Elections Board. Respondents point out that, despite the aggregate limits on the amount of money all PACs may contribute to a party-related committee ($150,000), these committees are primarily funded with PAC money. During the 1983–84 period, 77 percent of contributions to legislative campaign committees came from PACs. Shea, *Legislative Campaign Committees: The Wisconsin Experience,* p. 6 (a research report pre-

pared for Common Cause in Wisconsin, available at the Legislative Reference Bureau). In 1987–88, 70 percent of contributions to legislative campaign committees came from PACs.[18] As Petitioners point out, these contributions to legislative campaign committees are within the aggregate limits set forth in sec. 11.26(8)(a) which limit the total amount of money party-related committees may receive from all PACs to $150,000. While the $150,000 aggregate limit may have some significance in the context of a particular committee, that aggregate limit has little significance in the context of an individual candidate's campaign. That is, if a legislative campaign committee received a total of $150,000 in contributions from PACs, the corrupting influence of that money on any one candidate is diminished only if there is a limit set on the amount an individual candidate may receive from that committee. Without a limit (such as in sec. 11.26(9)(a)), any one of these PAC-dominated committees could contribute an unlimited amount of this money to any individual candidate, thereby resulting in a "special interest" candidate. Without sec. 11.26(9)(a) the restrictions on the amount an individual committee may contribute to a candidate become meaningless. Instead of being limited to contributing $500 to an assembly candidate, for example, a PAC could contribute $6,000 to a legislative campaign committee, which in turn could give that $6,000 to the assembly candidate. Without limits on the party-related committee, it could pass $6,000 from each PAC to an individual candidate, thereby rendering the $500 PAC-to-candidate limit meaningless. We note that sec. 11.26(9)(a) is in fact the

[18]Wisconsin State Elections Board Report on Campaign Activity for 1987–1988. This 70 percent figure is derived from statistics regarding legislative campaign committees on pages IV-7, IV-12, IV-46, and IV-55 of the Report.

only limitation on a party-related committee's contributions to an individual candidate. By placing restrictions on the party-related committee's ability to contribute, the corrupting influence of large contributions to that committee, is diffused.

We conclude that Respondents have demonstrated that there is a compelling state interest in placing an aggregate limit on the contributions that an individual candidate may receive from all committees. The purpose of sec. 11.26(9)(a), Stats., along with other restrictions on contributions to individual candidates, is to limit the impact of huge special interest contributions on a candidate and to encourage a broad and diverse base of support in order to prevent either actual corruption or the appearance of corruption. In *Buckley,* the Court recognized that, although the ceiling imposed on an individual's total contributions did impose an ultimate restriction upon the number of candidates and committees with which an individual could associate by means of financial support, an aggregate limit was necessary in order to prevent evasion of the individual-candidate contribution limit by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to committees likely to contribute to that candidate, or huge contributions to the candidate's political party. The Court concluded that this additional restriction imposed by the overall ceiling "is thus no more than a corollary of the basic individual contribution limitation that we have found to be constitutionally valid." 424 at 38. So, too, we conclude that the aggregate limit on committee contributions is necessary because of the ability of committees having the same interests to join together and make large contributions which could unduly dominate an

individual candidate's campaign. All of the contribution limits set on PACs and party-related committees are necessary in order to prevent individual candidates from becoming unduly dependent upon large narrow interest contributions.

Next we consider whether sec. 11.26(9)(a), Stats., is narrowly tailored to pass the strict scrutiny test. Petitioners argue that sec. 11.26(9)(a) is unnecessary because other existing statutory limits on committee contributions prevent proliferation of PACs, laundering of PAC funds through political party committees, and excessive PAC influence on a candidate's campaign. First of all, candidates may not accept more than 45 percent of their disbursement level from PACs. Section 11.26(9)(b). A party-related committee may not receive more than $150,000 in aggregate contributions from PACs and other committees in a biennium. Sections 11.26(8)(a) and 11.265(2). All county, congressional, legislative, local and other affiliated committees of the party are also subject to these restrictions. Section 5.02(13). The $6,000 limit on "committee" contributions to a party-related committee pertains to the subunits and affiliates of the contributing committee. Section 11.26(8)(b). Both "earmarking" contributions to a party for a specific candidate and "laundering" contributions for a candidate through a party are prohibited by secs. 11.16(4) and 11.30(1), Stats., respectively. In addition, all contributions by an individual, including those to committees, are limited in the aggregate to $10,000. Section 11.26(4). Finally, all political party committees, PACs, out-of-state committees, and national parties are subject to disclosure requirements. Sections 11.06(1)(a) and 11.06(3w). Accordingly, Petitioners contend that sec. 11.26(9)(a) is not the least restrictive means of preventing corruption.

59

Respondents, however, contend that sec. 11.26(9)(a), Stats., is all that stands between PACs and the candidate. As illustrated by the example of the legislative campaign committees, Respondents' statement is not far-fetched. Despite all of the contribution limits on PACs, without sec. 11.26(9)(a) PAC-dominated party-related committees would be able to contribute $150,000 of PAC money to an individual candidate. Furthermore, we conclude that no provisions prevent narrow issue PACs from proliferating into several other committees. Therefore, there is potential for these narrow issue PACs with large aggregations of wealth to circumvent the PAC-candidate contribution limits if it were not for secs. 11.26(9)(a) and (b). *See NRWC,* 459 U.S. at 210. While overt "earmarking" and "laundering" are prohibited, these measures are not enough. In order to maintain the integrity of the political process and prevent corruption caused by large contributions to an individual candidate from a narrow special interest group, effective and comprehensive contribution limits are required.

Petitioners suggest that legislative campaign committees and political party committees do not pose the same threat of corruption as PACs and should therefore be excluded from sec. 11.26(9)(a), Stats.

The legislature, by enacting sec. 11.26(9)(b), Stats., asserted that party-related committees can reflect a broader base of public support than PACs. Section 11.26(9)(b) prohibits PACs from contributing more than 45 percent of a candidate's disbursement level. Section 11.26(9)(a) however, sets the contribution limit for all committees, including party-related committees, at 65 percent, thus, guaranteeing them at least 20 percent of the candidate's disbursement level.

Although the legislature recognized that party-related committees can represent diverse interests, the

60

contention that these party-related committees necessarily have a broader base of public support than PACs is not supported by the statistics of the Wisconsin State Elections Board. For example, the vast majority of contributions to legislative campaign committees come from PACs. (70 to 77 percent, *See supra* at 26.) Furthermore, a handful of large PAC contributors dominate the field of contributors to these committees. Shea, at p. 7. (The contributions of the 7 largest PACs accounted for 40 percent of total PAC contributions.) It is interesting to note that these major PAC contributors generally give across the board to the campaign committees of both parties. *Id.*

> The pattern of giving by these major PACs showed remarkable similarities. Except for the PACs associated with labor organizations, there was a strong tendency to give across the board to the campaign committees of both parties. However, the Democrats typically did receive larger total amounts from individual PACs, no matter what the partisan inclinations of the particular PAC might be. The explanation for this pattern of providing political money lies in the fact that the Democrats control both houses of the legislature. Legislators from both parties agreed that it is easier to raise money from PACs when your party is in the majority. Stated from a different perspective: PACs give more money to the people who have more power. *Id.*

Respondents also argue that sec. 11.26(9)(a), Stats., is necessary in order to act as a buffer between the flow of money from PACs to the national political parties, which are entitled under both federal and state law to make unlimited contributions to state and local political party committees, which, if not for sec. 11.26(9)(a) would be allowed to make unlimited contributions to an

individual candidate. Sections 11.26(8)(a) and (b). While we do not have any evidence before us upon which we could base our conclusion that party-related committees in Wisconsin are in fact receiving a significant amount of contributions through this manner, we are convinced that there is certainly the potential for this type of abuse, which is sufficient under *NRWC*, 459 U.S. at 210, to justify the regulation.

We conclude, based on this evidence, that there would be a potential for undue domination of a candidate's campaign by narrow interest PAC contributions if party-related committees were not restricted in their ability to contribute to an individual candidate. Therefore, we reject petitioner's argument that party-related committees should not be included in the aggregate contribution limit on all committee contributions set forth in sec. 11.26(9)(a), Stats.

Petitioners also argue that sec. 11.26(9)(a), Stats., unduly restricts a committee's ability to make even a symbolic expression of support by placing an absolute ban on committee contributions once a candidate has received the aggregate limit from committees. We conclude that sec. 11.26(9)(a) does not place an absolute ban on committee contributions. The 65 percent limit is not absolute. That is, the 65 percent limit is on contributions which have been "receive[d] and accept[ed]" by the candidate. Section 11.26(9)(a). Once a candidate has reached the aggregate limit, the candidate may always return some contributions from committees in order to accept contributions from other committees. As Professor Adamany recommended in 1974 to Governor Lucey, the candidate "will select which groups he receives support from and in what amounts." *See supra* at p. 23. The aggregate limit encourages candidates to seek a broad base of support by allowing many people to make smaller

contributions. Encouraging smaller contributions from a greater number of contributors is a legitimate legislative goal. In *Buckley,* the Court concluded that contribution limits did not prohibit candidates from raising the money they needed to spend, noting that large-scale campaigns have successfully operated on contributions raised under a voluntarily imposed $100. contribution limit. 424 U.S. at 21–22, n.23.

In addition, committees retain an extraordinary ability to express themselves, notwithstanding the aggregate limit set forth in sec. 11.26(9)(a), Stats. The aggregate limit on committee contributions does not prohibit PACs from spending unlimited amounts of money on independent expenditures to support or oppose candidates.[19] The ability of associations to make these unlimited expenditures was the cornerstone of the *Buckley* decision and the Supreme Court's later decision in *FEC v. National Conservative Political Action Committee,* 470 U.S. 480 (1985). Just as the Court recently in *Austin* rejected the notion that restrictions on corporate spending constituted an absolute ban on all forms of corporate political spending, we conclude that sec. 11.26(9)(a) does not impose an absolute ban on committee spending once the aggregate limit has been reached. *Austin,* 110 S.Ct. at 1398.

Petitioners point out, however, that legislative campaign and political party committees cannot make independent expenditures in support of or in opposition to candidates, and that therefore, sec. 11.26(9)(a), Stats., is overbroad. Party-related committees cannot make independent expenditures because it is assumed that due to

---

[19]Independent expenditures are expenditures which are not made at the request or suggestion of the candidate, or in cooperation or in concert with the candidate. Section 11.06(7m), Stats.

their close relationship with the candidate all of their expenditures are made on behalf of the candidate.

First of all, Petitioners overlook the special status conferred upon party-related committees. Other than sec. 11.26(9)(a), Stats., there are no limits on party-related committees' ability to contribute to the candidate. Even the limit set in sec. 11.26(9)(a) is generous, allowing a party-related committee to contribute up to 65 percent of a candidate's disbursement level and, in any event, reserving 20 percent of that amount for party-related committee contributions. In addition to these generous contribution limits, party-related committees can make unlimited expenditures on generic party-building activities, i.e. "Vote Republican." Party-related committees may also receive unlimited amounts of money from their national counterparts and distribute unlimited amounts to county and congressional district units of the party. Sections 11.26(8)(a) and (b), Stats.

Moreover, party-related committees may act as a "conduit" for individual contributions to candidates. A "conduit" is any individual or organization that receives a contribution and then transfers the contribution to another individual or organization without exercising discretion over the amount of the contribution or identity of the candidate who receives the contribution. Section 11.01(5m), Stats. A contribution which is passed through a conduit to a candidate is considered a contribution from the contributor and not from the conduit or its sponsoring organization. Section 11.26(12m), Stats.[20] Therefore, we conclude that both PACs and party-

---

[20]*See* 1989 Wis. L. Rev. at 1482. This student author suggests that the aggregate contribution limits on committee contributions have led to an increase in conduit contributions as well as other "covert" campaign activity.

related committees retain significant methods of engaging in political expression in addition to contributing money directly to a candidate's campaign. The *Buckley* Court recognized that limitations on contributions served a legitimate state interest—prevention of dependence of a candidate on any one contributor.

> Under a system of private financing of elections, a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign. The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy. To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined.

424 U.S. at 26–27.

■

We conclude that sec. 11.26(9)(a), Stats., is necessary as part of Wisconsin's Campaign Financing Law, in order to prevent the domination of any individual candidate's campaign by narrow special interest contributions. We reject petitioner's assertion that the individual contribution limits on individual PACs are sufficient because the legislature has indicated that these limits could easily be circumvented through amoeba-like proliferation. Finally, while the aggregate limit ($150,000) on all PAC contributions to party-related committees may have some significance in the context of a particular committee, that aggregate limit becomes meaningless in the context of an individual candidate's campaign. Without sec. 11.26(9)(a) a committee could

contribute all of that PAC money ($150,000) to a single candidate. Therefore, we accept Respondent's contention that sec. 11.26(9)(a) is necessary to serve the compelling state interest of preventing corruption caused by the dependence of an individual candidate upon large special interest contributions.

Petitioners also assert that sec. 11.26(9)(a), Stats., is fatally underinclusive because the means selected to achieve the purpose of the statute provide only ineffective support for that purpose. Petitioners claim that the limits in sec. 11.26(9)(a) increase PAC influence on individual candidates by encouraging PACs to act as conduits for individual candidates, which Petitioners contend, is a legal loophole around the PAC-candidate contribution limits. That is, by relying on conduits, candidates could receive all of their funding from large "PAC" contributions, notwithstanding the existing legal limits on contributions.

As discussed above, a conduit is any individual or organization that receives a contribution from an individual and then transfers the contribution to another individual or organization without exercising discretion over the amount of the contribution or identity of the candidate who receives the contribution. Section 11.01(5m), Stats. While there may be potential for the conduits to, in fact, exercise discretion over the individual's contribution, even though it is prohibited, we conclude that this problem does not justify abandoning other campaign reform provisions and would amount to "throwing away the baby with the bath water."

Petitioners also argue that sec. 11.26(9)(a), Stats., is overbroad because it bans committee contributions from all committees, regardless of size, wealth, number of

members, or diversity of interests, once a candidate has received the aggregate limit. While it is true that sec. 11.26(9)(a) applies to all committees irrespective of their membership, wealth or interests, the issue is whether there is a potential for corruption. *NRWC*, 459 U.S. at 210. There is potential for corruption with all committees, regardless of whether they are rich, poor, single-issue or diverse. If any one committee, or any committee and its progeny, is able to contribute large amounts of money to any particular candidate, there is a potential for corruption.

Next Petitioners challenge sec. 11.26(9)(a), Stats., on the grounds that it violates their freedom of association guaranteed by the first amendment. Petitioners assert that sec. 11.26(9)(a), Stats., arbitrarily cuts off candidate's contributions from committees once the 65 percent cap has been reached, thereby forcing individuals to contribute as individuals, and not as members of a committee. Petitioners claim that the net effect of sec. 11.26(9)(a) is to encourage individuals to dissociate themselves from political committees, including political party committees once the 65 percent cap has been reached.

We disagree with Petitioners that sec. 11.26(9)(a), Stats., causes individuals to dissociate themselves from committees. The effect of sec. 11.26(9)(a) is simply to limit the amount of money a party-related committee can contribute directly to a candidate's campaign. This limit has no impact on an individual's ability to contribute to a committee. Furthermore, this argument suggests that individuals have an unfettered first amendment right to contribute to a particular candidate through a committee. In fact, if the purpose of an individual contribution to a committee is to give that money to a particular candidate, then sec. 11.26(9)(a) becomes even

more important. The individual has a right to contribute to the committee, but once that individual's contribution becomes a "committee" contribution, the individual loses the ability to direct where that contribution should go. Once it becomes a "committee" contribution, it is up to the committee to decide how to spend it. As Professor Adamany has noted, there is not a direct relationship between contributions by individuals to PACs and contributions by PACs to candidates.

> [PACs] collect ample treasuries in small individual gifts from many locales, centralize those funds in the hands of institutional officers, and then make large contributions in strategically important races anywhere in the country. The real or effective financial constituency in these circumstances is the PAC and its leadership, not the small givers to PAC campaign warchests. The candidate knows the programs and objectives of the PAC, and it is to the PAC officers that preferred access is given.

Adamany, *PAC's and the Democratic Financing of Politics,* 22 Ariz. L. Rev. 569, 596 (1980).

We conclude that the limits on committee contributions do not cause individuals to disassociate themselves from committees. Individuals join and contribute to committees for many reasons, but they are never guaranteed that their contributions will ultimately somehow be transmuted into a contribution to the candidate. This would be true of a committee which had already contributed the amount allowed by law to a particular candidate as well as to a committee which had not yet made a contribution to a particular candidate.

Our conclusion is consistent with federal law. While United States Supreme Court cases almost proscribe limitations on the rights of individuals to freely associate

when referendum or "ballot measures" are involved, restrictions on that right are tolerated where groups of individuals are contributing to a candidate's campaign. *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290 (1981). In *Citizens Against Rent Control,* the Court held that a limit of $250 on individual contributions to committees formed to support or oppose a referendum issue violated freedom of association. The Court distinguished between associations contributing to a candidate's campaign and associations contributing to a ballot measure or referendum issue. As the Court stated in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 790 (1978), "[t]he risk of corruption perceived in cases involving candidate elections [cite omitted] simply is not present in a popular vote on a [referendum] issue." In the referendum context, there is no "quid pro quo" that can inure to the contributor as is possible when the support of a candidate for office is sought by making the contribution.

Because we hold that sec. 11.26(9)(a), Stats., does not violate the first amendment, we must address Petitioners' contention that it discriminates against committees and the individuals who contribute to them, in favor of individuals who contribute directly to candidates, as well as in favor of "early" contributors, to the detriment of "late" contributors, in violation of the equal protection clauses of the United States and Wisconsin Constitutions.

"Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin,* 110 S.Ct. 1391, 1401 (1990). A statute will violate the equal protection clause if the limits imposed

by the statute impose the first amendment rights of one group to a greater extent than the limits burden the same rights of another group and if such differential treatment is not justified by a compelling state interest and narrowly tailored to accomplish that end. *California Medical Assn. v. FEC,* 453 U.S. 182, 200 (1981).

First we must determine whether sec. 11.26(9)(a), Stats., imposes a greater burden on the first amendment rights of committees than it does on the first amendment rights of individuals. Petitioners claim that sec. 11.26(9)(a) could have the effect of prohibiting some committees from making even a symbolic contribution to a particular candidate if the candidate has already received the amount allowed. We note that sec. 11.26(4) which places an aggregate limit of $10,000 on the total contributions an individual may make to all candidates and committees combined in a calendar year, may also have the effect of prohibiting an individual from making even a symbolic contribution to a particular candidate. In fact, there is no corresponding aggregate limit on a committee's total contributions to all candidates and committees. Because both committees and individuals are subject to limits which may have the effect of prohibiting them from making even a symbolic contribution to an individual candidate, we conclude that sec. 11.26(9)(a) does not impose a greater burden on the first amendment rights of committees than is imposed on the first amendment rights of individuals by contribution limits set by other provisions in Wisconsin's campaign financing law.

Even if we were to conclude that sec. 11.26(9)(a), Stats., treats committees differently than individuals, the United States Supreme Court has recognized that different entities may be treated differently if different forms of regulation are necessary in order to protect the

70

integrity of the electoral process. *California Medical Assn. v. FEC*, 453 U.S. 182, 201 (1981). Just as the aggregate limit on individual contributions is tailored to prevent individuals from circumventing other contribution limits, so, too, is the aggregate limit on committee contributions tailored, albeit in a different manner, to prevent single interest committees from unduly influencing a particular candidate's campaign.

Next we consider petitioner's argument that the statute imposes a greater burden on the first amendment rights of committees which make their contributions "late" in the campaign than committees which make their contributions "early" in the campaign. Petitioners characterize the effect of the aggregate limit on committee contributions to be a race by committees to get their contribution in to a particular candidate before the aggregate limit is reached. Accordingly, they assert that there is nothing inherently more "corrupt" about those committees which wish to make a contribution after the aggregate limit is reached when compared to those committees which were able to get their contributions in before the aggregate limit was reached.

They point out that this is particularly significant with respect to political party committees because they typically are "late" contributors. Political party committees generally make contributions to individual candidates only after a primary run-off election has taken place. Because the aggregate limit applies to both the primary and general election, petitioners claim the aggregate limit has the effect of preventing political party committees from contributing to a candidate's campaign.

Perhaps in recognition of the fact that parties do not contribute until later in a candidate's campaign, sec. 11.26(9)(a), Stats., together with sec. 11.26(9)(b)

reserves 20 percent of the candidate's disbursement level for party-related committees. Therefore, we disagree with petitioners that the first amendment rights of party-related committees are burdened more than the first amendment rights of PACs which are typically considered "early" contributors.

On the statute's face, PACs which contribute late are treated differently than PACs which contribute early to a candidate's campaign, just as party-related committees which contribute late are treated differently than party-related committees which contribute early. However, we conclude that no committees are ever guaranteed that a candidate will accept their entire contribution. A candidate may refuse to accept contributions over a certain amount. A candidate may refuse a contribution from a certain committee. As Professor Adamany recognized, a candidate may return part of a contribution and make room for another contribution, thereby allowing all committees to contribute, albeit in a smaller amount. Therefore, we conclude that whether or not a committee will ultimately be able to contribute to a candidate is left up to the candidate and does not necessarily correlate with the timing of the contribution. Accordingly, we conclude that sec. 11.26(9)(a), Stats., does not impose a greater burden on the first amendment rights of "late" contributors than it does on "early" contributors.

In summary, we conclude that the aggregate contribution limit set forth in sec. 11.26(9)(a), Stats., places only a marginal restriction on the first and fourteenth amendment rights of committees and candidates. The aggregate contribution limit is necessary to serve the State's compelling interest in preventing narrow issue PACs from circumventing PAC-candidate contribution

72

limits through contributions to party-related committees, thereby unduly influencing an individual candidate's campaign. We conclude that the aggregate contribution limit does not place a limit on a candidate's ability to spend money. The aggregate limit encourages candidates to seek contributions from a greater number of sources and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression. Section 11.26(9)(a), Stats., allows candidates to decide which contributions they will accept, from whom, and in what amount and, therefore, whether a committee contribution will be accepted is left to the discretion of the candidate, and is not necessarily related to the timing of the contribution. Furthermore, we conclude that sec. 11.26(9)(a) survives strict scrutiny, for it is narrowly tailored to accomplish this goal while allowing both PACs and party-related committees to retain significant methods of engaging in political expression in addition to contributing money directly to a candidate's campaign.

For the reasons set forth in this opinion we conclude that sec. 11.26(9)(a), Stats., does not violate the First or Fourteenth Amendments of the United States Constitution, nor the equivalent provisions of the Wisconsin Constitution.

*By the Court.*—Rights Declared. Section 11.26(9)(a), Stats. declared constitutional. The stay of proceedings in *State of Wisconsin Elections Board v. John Gard and Friends and Neighbors of John Gard,* Case No. 89–CV–219, pending in Oconto County Circuit Court is vacated.

Justice Bablitch took no part.