ELECTIONS BOARD OF the STATE of Wisconsin, Plaintiff-Appellant,

v.

WISCONSIN MANUFACTURERS & COMMERCE, WMC Issues Mobilization Council, Inc., ABC Corporation and XYZ Corporation, Defendants-Respondents.

Supreme Court

*No. 98–0596. Oral argument January 7, 1999.—Decided July 7, 1999.*

(Also reported in 597 N.W.2d 721.)

650

For the plaintiff-appellant the cause was argued by *Cynthia R. Hirsch*, assistant attorney general, with whom on the briefs (in the Court of Appeals) was *James E. Doyle*, attorney general.

For the defendants-respondents there was a brief (in the Court of Appeals) by *Robert J. Dreps, Brady C. Williamson* and *LaFollette & Sinykin*, Madison and oral argument by *Brady C. Williamson, Jr.*

Amicus curiae brief (in the Court of Appeals) was filed by *Jan Witold Baran, Kirk Lincoln Jowers* and *Wiley, Rein & Fielding*, Washington, D.C.; *Robert C. Burrell, R. Jeffrey Wagner* and *Borgelt, Powell, Peterson & Frauen, S.C.*, Milwaukee; of counsel, *Stephen A. Bokat, Robin S. Conrad* and *National Chamber Litigation Center, Inc.*, Washington, D.C.; *Jan Amundson* and *National Association of Manufacturers*, Washington, D.C. for the Chamber of Commerce of the United States, the National Association of Manufacturers, the National Association of Wholesaler-Distributors, Food Distributors International and the Association for Manufacturing Technology.

Amicus curiae brief (in the Court of Appeals) was filed by *Glenn Moramarco* and *Brennan Center for Justice*, New York, NY and *Elizabeth Adelman* and *Adelman & Hynes, S.C.*, Milwaukee for Senator Charles Chvala.

Amicus curiae brief (in the Court of Appeals) was filed by *Dan Conley, Brian D. Winters, Michael Fischer*

and *Quarles & Brady*, Milwaukee and *Peter M. Koneazny*, legal director, Milwaukee for the American Civil Liberties Union of Wisconsin, Inc.

Amicus curiae brief (in the Court of Appeals) was filed by *Lillian BeVier* and *University of Virginia Law School*, Charlottesville, VA and *Paul W. Schwarzenbart* and *Lee Kilkelly, Paulson & Kabaker, S.C.*, Madison for the Wisconsin Grocers Association, Inc.

Amicus curiae brief was filed by *Lester A. Pines, Curt F. Pawlisch* and *Cullen, Weston, Pines & Bach*, Madison for the Madison Teachers, Inc.

¶ 1. N. PATRICK CROOKS, J. This case is before the court as a result of the parties' joint petition to bypass pursuant to Wis. Stat. § (Rule) 809.60 (1995–96).[1] The issue presented is whether the circuit court properly dismissed the complaint of the Elections Board of the State of Wisconsin (the "Board") charging the respondents with various violations of the campaign finance laws contained in Wis. Stat. ch. 11 following the respondents' broadcast of several advertisements. The Board contends that respondents are subject to ch. 11 regulation because their ads had the "political purpose of expressly advocating" the defeat or re-election of the incumbent state senators and representatives named in the ads. We conclude that the respondents, when they broadcast the advertisements, lacked fair warning that the ads could qualify as express advocacy in Wisconsin under a context-based approach. The Board, in effect, engaged in retroactive rule-making in attempting to apply such an approach.

[1] All references to the Wisconsin Statutes are to the 1995–96 version.

¶ 2. Since this violation of due process—fundamental fairness—is determinative of the issue of whether these respondents can be prosecuted for the ads involved, there is no need for us to decide whether the ads are express advocacy. We therefore affirm the circuit court's dismissal of the Board's complaint.

¶ 3. We also determine that the definition of the term express advocacy is not limited to the specific list of "magic words" such as "vote for" or "defeat" found in *Buckley* footnote 52. A context-based approach to defining express advocacy may present an attractive alternative, but we note that several courts have rejected such an approach.[2] If there is to be a further attempt to fashion a rule governing express advocacy advertisements, leaving that task is appropriately left to the legislature or the Board, consistent with this opinion.

## I.

¶ 4. The respondents in this action are four Wisconsin corporations. Respondent WMC Issues Mobilization Council, Inc., (IMC), is a non-stock, non-profit corporation which receives financial support from respondents ABC Corporation and XYZ Corporation. To protect their privacy, IMC has refused to name ABC and XYZ. Respondent Wisconsin Manufacturers & Commerce, a non-profit corporation, also provides financial support to IMC.

---

[2] As counsel for the respondents descriptively stated at oral argument, "A voyage into the question of context is not only a swamp for the judiciary, it's a voyage without end." Several cases, set forth later in this opinion, have discussed the issue of a context-based standard and voiced somewhat similar criticism.

¶ 5. The Board is the state agency responsible for the administration of the campaign finance laws in Wis. Stat. ch. 11 and other laws related to elections and campaigns. *See* Wis. Stat. §§ 5.05(1), 15.61. In the event of a ch. 11 violation involving a statewide election or the filing of a required report or statement, the Board may bring a civil forfeiture action under Wis. Stat. § 11.60. § 5.05(1)(c). The Board may seek injunctive or other relief to enforce laws governing elections and campaigns. § 5.05(1)(d). The Board also has the power to enact rules pursuant to Wis. Stat. ch. 227 to interpret and administer the election and campaign laws. *See* § 5.05(1)(f).

¶ 6. In late October, 1996, IMC produced advertisements referring to six incumbent state legislators who were hoping to be re-elected in the November 5, 1996, general election. Each ad described a legislator's vote on specific issues and encouraged viewers or listeners to call the legislator to express approval or disapproval of the legislator's position.[3] The ads aired

---

[3] Following is the full text of the advertisements:

■ State Senator Lynn Adelman is standing in the way of reform. Voting against curbs on frivolous lawsuits that cost Milwaukee jobs. What's worse, Adelman's made a career of putting the rights of criminals ahead of the rights of victims: Voting to deny employers the right to keep convicted felons out of the workplace. That's wrong. That's liberal. But that's Lynn Adelman. Call Lynn Adelman. Tell him honest working people have rights, too.

■ You-make-the-call! Senator Chuck Chvala voted to increase income taxes, sales taxes, and capital gains taxes by over a billion dollars. Then he voted against the largest property tax cut in Wisconsin history. Is he: "A," A liberal? "B," A big spender? "C," Out of touch? Or "D," All of the above? If you said "D" all of the above, you made the right call! Make another right call to Chuck Chvala. . .He never met a tax he didn't hike.

■ The following message is paid for by WMC Issues Mobilization Council, Inc. — Businesses working in the public interest. There's

on television and/or radio stations in the relevant state senate and assembly districts.

still one team in Wisconsin with a perfect record. It's the tax team of State Representatives Dave Plombon and Mike Wilder. They agree on most everything, voting with the Madison liberals nearly 100% of the time. In the State Assembly, Plombon and Wilder voted against cutting property taxes for Chippewa Valley homeowners. Working together, they voted against spending controls on local government. Plombon and Wilder even voted against millions in additional state aid for Chippewa Valley schools. State Representatives Dave Plombon and Mike Wilder. The tax team of the Chippewa Valley. Liberal on taxes and spending. Wrong on education. If you don't like the way the tax team is playing with your money, call them at 1–800–362–9472. Tell them Chippewa Valley homeowners deserve lower taxes and our kids deserve better schools.

■ Representative Dave Plombon voted against the largest property tax cut in Wisconsin history. More than 15% for the average Chippewa Valley homeowner. Then Plombon voted against an additional 21 million dollars in state aid for schools right in his own district. Dave Plombon. Less money for our children. Higher taxes for us. Call Dave Plombon today. Because if he's consistently voting against the Chippewa Valley, just who is he voting for?

■ State Representative Mike Wilder has a problem with taxes. He doesn't like to. . .cut them. When it came to a 14% cut in property taxes for the average Chippewa Valley homeowners, Mike Wilder said "No." And when it came to an additional 33 million dollars in state aid for schools right in his own district, Mike Wilder turned his back on us again. Give Mike Wilder a call. Tell him you've got a problem with high taxes, too.

■ What has Gary Drzewiecki done for Northeast Wisconsin? Homeowners will see their property taxes cut by an average of 11.5% Our children's schools will receive millions in additional state aid. And taxpayers will get spending controls on local government. Lower taxes, less spending, better schools. It's a record we can all be proud of. Call Gary Drzewiecki and tell him thanks.

■ This year, Wisconsin homeowners received their property taxes cut by almost 17%. No thanks to Senator Alice Clausing. She voted against the largest property tax cut in Wisconsin history. Then Clausing voted against an additional 36 million dollars for schools—right in her own district. Alice Clausing. Liberal on

¶ 7. The legislators featured by the ads filed administrative complaints with the Board against IMC, contending that the advertisements subjected IMC to regulation under Wis. Stat. ch. 11. When the Board did not immediately address their complaints, the legislators sought injunctive relief under Wis. Stat. § 11.66 in circuit courts around the state. On October 31, 1996, the Dane County Circuit Court ordered a temporary injunction restraining IMC from broadcasting its advertisements. The circuit courts involved in the related suits swiftly did the same. IMC filed an emergency petition for a supervisory writ with the court of appeals. The court of appeals granted the writ in part and denied it in part, leaving the injunctions in place.

¶ 8. On March 14, 1997, the Board issued its order regarding the legislators' administrative complaints. The Board found that IMC had engaged in express advocacy and ordered IMC to comply with the provisions of Wis. Stat. ch. 11 by April 15, 1997. Specifically, the Board ordered IMC to file a campaign registration statement and a campaign finance report detailing all contributions made or received, and all disbursements made or obligations incurred, during 1996.

¶ 9. IMC refused to comply with the Board's order. The Board responded by filing the present action in Dane County Circuit Court on June 26, 1997. In its complaint, the Board alleged that IMC's advertisements had the "political purpose of expressly advocating" defeat or re-election of the named legislators. Therefore, the Board asserted, the four

Taxes. . .Wrong on education. Call Senator Clausing. Tell her to stop voting with those Madison liberals.

Compl., Attach. 1–7.

respondents (collectively, "WMC") were subject to various regulations under the campaign finance laws. The Board alleged that WMC failed to comply with the March 14, 1997, order[4] and had violated Wisconsin's campaign finance laws by: (1) failing to register in violation of Wis. Stat. § 11.05(1);[5] (2) failing to file financial reports regarding contributions in violation of Wis. Stat. § 11.06(1)(a);[6] (3) failing to file financial reports required by Wis. Stat. § 11.20(1) and (2);[7] and

[4] Like the circuit court, we are unable to discern from the allegations in the complaint which of the four respondents the Board deems responsible for failing to comply with its March 14, 1997, order. Although the complaint alleges that all respondents failed to comply with the order by filing the required reports, it also states somewhat inconsistently that its order was issued only against respondent IMC. *See* Compl. ¶¶ 61–65; Decision and Order at 6 n.3.

[5] Wis. Stat. § 11.05(1) provides:

**Registration of political committees, groups and individuals. (1)** COMMITTEES AND GROUPS. . . .[E]very committee other than a personal campaign committee. . .which makes or accepts contributions, incurs obligations or makes disbursements in a calendar year in an aggregate amount in excess of $25 shall file a statement with the appropriate filing officer giving the information required by sub. (3). . . .

[6] Wis. Stat. § 11.06(1) states:

**Financial report information; application; funding procedure. (1)** CONTENTS OF REPORT. . . .[E]ach registrant under s. 11.05 shall make full reports, upon a form prescribed by the board and signed by the appropriate individual under sub. (5), of all contributions received, contributions or disbursements made, and obligations incurred. Each report shall contain the following information. . .:
(a) An itemized statement giving the date, full name and street address of each contributor who has made a contribution in excess of $20. . . .

[7] Wis. Stat. § 11.20 provides:

(4) making contributions and/or disbursements for purposes unrelated to a referendum, in violation of Wis. Stat. § 11.38(1).[8] The Board sought per diem civil forfeitures as provided in Wis. Stat. §§ 11.60 and 11.38(4), costs, and an injunction requiring WMC to comply with the applicable statutory provisions.

¶ 10. WMC moved to dismiss the Board's complaint for failure to state a claim upon which relief can be granted. On January 16, 1998, the Dane County Circuit Court, Judge Sarah B. O'Brien presiding, granted WMC's motion. In a 29-page decision, the court determined that the Board could adopt a definition of express advocacy other than the one set forth by the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*), as long as that definition met the requirements of the First and Fourteenth Amendments to the United States Constitution. According to the court, the standard for express advocacy urged by the Board was a case-by-case determination based on the five-factor test of *Crawford v. Whittow*, 123 Wis. 2d 174, 183, 366 N.W.2d 155 (Ct.

Filing requirements. (1) All reports required by s. 11.06 which relate to activities which promote or oppose candidates for state office. . .shall be filed with the board. . . .

(2) Preprimary and preelection reports under s. 11.06(1) shall be received by the appropriate filing officer no earlier than 14 days and no later than 8 days preceding the primary and the election.

[8] Wis. Stat. § 11.38 provides:

Contributions and disbursements by corporations and cooperatives. (1) (a) 1. No foreign or domestic corporation. . .may make any contribution or disbursement, directly or indirectly, either independently or through any political party, committee, group, candidate or individual for any purpose other than to promote or defeat a referendum. . . .

App. 1985),[9] and could not fairly be applied to WMC because the Board had not previously published or formally adopted it. Further, the court reasoned, the Board's standard was unconstitutionally vague and was not sufficiently narrow to serve compelling governmental interests. Based on its conclusions, the court dismissed the Board's complaint with prejudice.

## II.

¶ 11. We apply a *de novo* standard when reviewing a circuit court's dismissal of a complaint for failure to state a claim. *Hermann v. Town of Delavan*, 215 Wis. 2d 370, 378, 572 N.W.2d 855 (1998); *Watts v. Watts*, 137 Wis. 2d 506, 512, 405 N.W.2d 305 (1987). In our review, we must accept as true all facts in the complaint and all reasonable inferences which may be drawn from them. *Watts*, 137 Wis. 2d at 512. *See Hermann*, 215 Wis. 2d at 378. Dismissal is proper only when it is clear that the plaintiff would not be entitled to relief under any facts which could be proved. *Hermann*, 215 Wis. 2d at 378; *Watts*, 137 Wis. 2d at 512; *Crawford*, 123 Wis. 2d at 178.

¶ 12. In its complaint, the Board alleges that WMC is subject to regulation because its ads had the "political purpose of expressly advocating the defeat" or

---

[9] In *Crawford v. Whittow*, 123 Wis. 2d 174, 183, 366 N.W.2d 155 (Ct. App. 1985), the court of appeals adopted the Board's five-factor test for determining whether an act was for "political purposes" under Wis. Stat. § 11.01(16). The court stated that the following factors should be considered: "(1) the distributor's intentions as to political office; (2) the content of the materials; (3) the manner of distribution; (4) the pattern and frequency of distribution; and (5) the value of the distributed materials." *Crawford*, 123 Wis. 2d at 183.

re-election of the featured legislators. Under Wis. Stat. § 11.01(16)(a)1, "[t]he making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate . . ." is an act for "political purposes." A payment made for "political purposes" may qualify as a "contribution" under § 11.01(6)(a)1 or a "disbursement" under § 11.01(7)(a)1.[10] It is the respondents' contributions and/or disbursements that the Board asserts triggered the sections of ch. 11 allegedly violated by WMC. Accordingly, whether the Board's complaint has stated a claim upon which relief can be granted would seem to depend upon whether WMC's advertisements constitute express advocacy as provided in § 11.01(16)(a)1.

¶ 13. Statutory interpretation is a question of law which this court reviews *de novo*, although we are benefited in this case by the analysis of the circuit court. *See Peters v. Menard, Inc.*, 224 Wis. 2d 174, 184, 589 N.W.2d 395 (1999); *Forest County v. Goode*, 219 Wis. 2d 655, 663, 579 N.W.2d 715 (1998). The main goal of statutory interpretation is to determine the legislature's intent. *Goode*, 219 Wis. 2d at 663; *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 281, 548 N.W.2d 57 (1996). Our first step is to examine the plain language of the statute. *Peters*, 224 Wis. 2d at 184; *Goode*, 219 Wis. 2d at

[10] "Disbursement" is defined by Wis. Stat. § 11.01(7)(a)1 to mean "[a] purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value. . . .made for political purposes." Similarly, § 11.01(6)(a)1 defines a "contribution" as "[a] gift, subscription, loan, advance, or deposit of money or any thing of value . . . made for political purposes . . . ." Section 11.01(6)(a)4 states that "[a] transfer of funds between candidates, committees, individuals or groups subject to a filing requirement under this chapter" is also a "contribution."

663. If the language is susceptible to only one meaning, we adopt that meaning and our analysis ends. *Goode*, 219 Wis. 2d at 663; *UFE*, 201 Wis. 2d at 281–82. If, on the other hand, reasonable minds could interpret the statutory language to mean more than one thing, the statute is ambiguous and we look to other sources to decipher the legislature's intended meaning. *Peters*, 224 Wis. 2d at 184–85.

¶ 14.　Express advocacy is not defined in the Wisconsin Statutes. The meaning of the term has not been clarified in any published Wisconsin case, and the Board has not published a definition of express advocacy.[11] We turn, therefore, to other sources for aid in interpreting the term.

¶ 15.　The express advocacy language was added to Wis. Stat. ch. 11 after the United States Supreme Court handed down its decision in *Buckley v. Valeo*, 424

---

[11] The Board's corresponding administrative regulation, like Wis. Stat. § 11.01(16)(a)1, refers to express advocacy without defining it. Wis. Admin. Code ElBd § 1.28 (Apr., 1998) provides in pertinent part:

　　(1)　Definitions. As used in this rule:

　　. . .

　　(b)　"Contributions for political purposes" means contributions made to 1) a candidate, or 2) a political committee or 3) an individual who. . .makes disbursements for the purpose of expressly advocating the election or defeat of an identified candidate.

　　(2)　Individuals other than candidates and committees other than political committees are subject to the applicable disclosure-related and recordkeeping-related requirements of ch. 11, Stats., only when they:

　　(a)　Make contributions for political purposes, or

　　. . .

　　(c)　Make expenditures for the purpose of expressly advocating the election or defeat of an identified candidate.

U.S. 1 (1976) (*per curiam*).[12] *See* § 27, ch. 328, Laws of 1979. In *Buckley*, the Court discussed the constitutionality of several provisions of the Federal Election Campaign Act of 1971 (FECA).[13] *Buckley*, 424 U.S. at 6. The Court emphasized that protection of political speech lies at the heart of the First Amendment, stating, "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression. . . ."[14] *Buckley*, 424 U.S. at 14.

---

[12] Similarly, Wis. Admin. Code ElBd § 1.28 (Apr., 1998) was created by an emergency rule promulgated after *Buckley*. *See* Wis. Admin. Code ElBd § 1.28 (Jan., 1977). *See also* 65 Op. Att'y Gen. 145, 152, 154 (1976) (advising the Board to enact emergency rules adopting a narrow interpretation, consistent with *Buckley*, of the political activity regulated by certain sections of Wis. Stat. ch. 11).

[13] The Court in *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*) actually considered the FECA as amended in 1974. *See Buckley*, 424 U.S. at 6 n.1. The relevant portions of the FECA are set forth in the Appendix to the *Buckley* opinion. *See Buckley*, 424 U.S. at 144–235.

[14] The First Amendment provides, "Congress shall make no law. . .abridging the freedom of speech. . .or the right of the people peaceably to assemble." U.S. Const. amend. I. The First Amendment applies to the states through the Fourteenth Amendment. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 336 n.1 (1995).

Free speech is also guaranteed by Art. I, § 3 of the Wisconsin Constitution, which provides, "Every person may freely speak, write and publish his sentiments on all subjects. . .and no laws shall be passed to restrain or abridge the liberty of speech or of the press." Art. I, § 4 of the Wisconsin Constitution addresses free association: "The right of the people peaceably to

¶ 16. The Court explained in *Buckley* that the First Amendment right of association is closely related to the right of free speech. *Buckley*, 424 U.S. at 15. "[E]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Id.* (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)). The right to associate includes the right to band together for the purposes of advocating political ideas or beliefs. *See id.* at 15, 22. *See also FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 494 (1985) [hereinafter *NCPAC*].

¶ 17. Based on these principles, the Court held in *Buckley* that it could avoid invalidating two provisions of the FECA, the expenditure limit in § 608(e)(1)[15] and the disclosure requirements of § 434(e),[16] on grounds of vagueness only if it limited their reach to funds paid for political communications that constituted express advocacy. *Id.* at 44, 80. More precisely, the *Buckley* court held that §§ 434(e) and 608(e)(1) could only be constitutionally applied to regulate payments "for communications that in express terms advocate the election or defeat of a clearly identified candidate for

---

assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

[15] Section 608(e)(1) limited expenditures "relative to a clearly identified candidate" to $1,000 per year. *Buckley*, 424 U.S. at 39 (quoting § 608(e)(1)).

[16] Section 434(e) required an individual or group (other than a political committee or candidate) that made more than $100 in contributions or expenditures in one year " 'for the purpose of. . .influencing' the nomination or election of candidates for federal office" to file a statement disclosing the amount contributed or spent. *Id.* at 77 (quoting § 434(e)).

federal office." *Id.* at 44. In discussing § 608(e)(1), the Court observed:

> [T]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions.

*Id.* at 42. Therefore, to "clearly mark the boundary between permissible and impermissible speech," *id.* at 41, the scope of political activity regulated by § 608(e)(1) must be "limited to communications that include explicit words of advocacy of election or defeat of a candidate," the Court held. *Id.* at 43.

¶ 18. Later in the opinion, the Court determined that the § 434(e) disclosure requirement "shares the same potential for encompassing both issue discussion and advocacy of a political result" as the expenditure limit in § 608(e)(1). *Id.* at 79. The Court explained that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64. Accordingly, the Court stated:

> To insure that the reach of § 434(e) is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construed the terms of § 608(e)—to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.
>
> . . .

> As narrowed, § 434(e), like § 608(e)(1), does not reach all partisan discussion for it only requires disclosure of these expenditures that expressly advocate a particular election result.

*Id.* at 80 (footnote omitted).

¶ 19. In footnotes, the Court elaborated on the meaning of its construction of §§ 434(e) and 608(e)(1) as applying only to speech which "expressly advocate[s] the election or defeat of a clearly identified candidate." *Id.* In footnote 52, the Court stated that such a construction "would restrict the application of § 608(e)(1) to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " *Id.* at 44 n.52. Following its discussion of the express advocacy standard as applied to § 434(e), the Court included a footnote referring back to footnote 52. *See id.* at 80 n.108.

¶ 20. Although the United States Supreme Court has cited *Buckley* in several cases, our research discloses only one in which the Court applied the *Buckley* express advocacy standard: *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) [hereinafter *MCFL*].[17] Massachusetts Citizens for Life (MCFL) had

---

[17] The United States Supreme Court recently considered the constitutionality of a FECA expenditures provision, but none of the opinions delivered by the fractured Court addressed the application of *Buckley*'s express advocacy standard. *See Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604 (1996). We note that the Court has granted certiorari but has not yet heard argument in a case in which the Eighth Circuit court of appeals held that Missouri's campaign contribution limits violate the First Amendment. *See Shrink Mo. Gov't PAC v. Adams*, 161 F.3d 519, 523 (8th Cir. 1998), *cert. granted*, 119 S. Ct. 901 (1999).

distributed a newsletter entitled, "Special Edition," and stating in bold-faced type, "EVERYTHING YOU NEED TO KNOW TO VOTE PRO-LIFE," "VOTE PRO-LIFE," and "No pro-life candidate can win in November without your vote in September." *MCFL*, 479 U.S. at 243 (emphasis in original). Also printed on the newsletter were the names and photographs of 13 candidates in the upcoming state and federal elections which had voting records consistent with MCFL's position on certain issues. *Id.* at 243–44. The newsletter contained a coupon listing the names of the "pro-life" candidates, to be detached and taken to the polls by readers, as well as a disclaimer stating that "[t]his special election edition does not represent an endorsement of any particular candidate." *Id.* at 243.

¶ 21. The issue in *MCFL* was whether, by distributing the newsletter, MCFL had violated § 441b of the FECA, which prohibits corporations from using treasury funds for expenditures "in connection. with" federal elections. *Id.* at 241. The Court determined that, under *Buckley*, § 441b would be overbroad unless the term "expenditure" in § 441b were construed as applying only to express advocacy. *Id.* at 248–49. Utilizing this narrowing construction, the Court held that MCFL was in violation of § 441b because its newsletter constituted express advocacy. *Id.* at 249–51. In reaching this holding, the Court interpreted *Buckley* as follows:

> *Buckley* adopted the "express advocacy" requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons. We therefore concluded in that case that a finding of "express advocacy" depended upon the use of language such as "vote

for," "elect," "support," etc., *Buckley, supra,* at 44, n.52.

*Id.* at 249. The Court then applied the *Buckley* standard to MCFL's newsletter:

> Just such an exhortation appears in the "Special Edition." The publication not only urges voters to vote for "pro-life" candidates, but also identifies and provides photographs of specific candidates fitting that description. The Edition cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than "Vote for Smith" does not change its essential nature. The Edition goes beyond issue discussion to express electoral advocacy. The disclaimer of endorsement cannot negate this fact.

*Id.* The Court concluded that MCFL's newsletter constituted express advocacy within the purview of § 441b. *Id.* at 249–50.

¶ 22. As stated previously, *Buckley* and *MCFL* comprise the entire volume of cases in which the United States Supreme Court has applied the express advocacy standard. We do not read *Buckley* and *MCFL* as requiring that a communication contain any specific "magic words" in order to constitute express advocacy. The words listed in footnote 52 of *Buckley* are merely examples of words which undoubtedly constitute "express words of advocacy of election or defeat," as evidenced by the Court's use of the phrase "such as" immediately preceding the list of words. *Buckley,* 424 U.S. at 44 n.52. Consistent with *Buckley,* when the Court summarized footnote 52 of *Buckley* in *MCFL,* it again introduced the words with the phrase "such as."

MCFL, 479 U.S. at 249. The Court in *MCFL* also suggested that the list of words in *Buckley*'s footnote 52 was exemplary, not exhaustive, when it stated, "The fact that this message [in the newsletter] is marginally less direct than "Vote for Smith" does not change its essential nature." *Id.* "Vote for" was one of the phrases used in footnote 52. *Buckley*, 424 U.S. at 44 n.52.

¶ 23. Further, it would be absurd to hold that those particular "magic words" of advocacy which the *Buckley* Court chose to mention in footnote 52 qualify as express advocacy while other, equally explicit words of advocacy do not. We can think of no reason to adopt an approach which would regulate an ad which said, "Defeat Smith," but not an ad which said, "Unseat Smith." *See Buckley*, 424 U.S. at 44 n.52. Consistent with the well-established rule that we should avoid absurd results when interpreting a statute, *see Campenni v. Walrath*, 180 Wis. 2d 548, 560, 509 N.W.2d 725 (1994), we hold that no particular "magic words" are necessary for a communication to constitute express advocacy.

¶ 24. In our view, *Buckley* stands for the proposition that it is unconstitutional to place reporting or disclosure requirements on communications which do not "expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80. Any standard of express advocacy must be consistent with this principle in order to avoid invalidation on grounds of vagueness and/or overbreadth. *See MCFL*, 479 U.S. at 248–49; *Buckley*, 424 U.S. at 44, 80. We are satisfied that for a political communication or advertisement to constitute express advocacy under *Buckley* and *MCFL*, it must contain explicit language advocating the election or defeat of a candidate who is clearly

identified.[18] *See MCFL*, 479 U.S. at 249–50; *Buckley*, 424 U.S. at 43, 44 & n.52, 80 & n.108. The explicit terms used need not have been chosen from a specific list of "magic words."

¶ 25. As stated previously, there is no Wisconsin case, statute, or regulation clarifying the meaning of the term express advocacy as used in Wis. Stat. § 11.01(16)(a)1. *Buckley* and *MCFL* constitute the only authority which binds Wisconsin courts on the subject.[19] It follows, then, that if WMC's advertisements

---

[18] It has been argued that language used by the United States Supreme Court in *MCFL* suggests that contextual factors are relevant in identifying express advocacy. In *MCFL*, the Court stated that a newsletter was express advocacy because it "in effect" instructed readers to vote for certain candidates. *MCFL*, 479 U.S. at 249. In addition, the Court commented that the "essential nature" of the language is not changed even though it "is marginally less direct than 'Vote for Smith.'" *Id.*

The FEC made this argument in *Maine Right to Life Committee v. FEC* and the court in that case rejected it. *See Maine Right to Life Comm. v. FEC*, 914 F. Supp. 8, 11 n.2 (D. Me. 1996), *aff'd per curiam*, 98 F.3d 1 (1st Cir. 1996), *cert. denied*, 118 S. Ct. 52 (1997). The court recognized that the presence of express terms of advocacy in MCFL's newsletter, such as "vote for," undermined the contention that *MCFL* "loosened the *Buckley* requirement." *Id.* The Court in *MCFL* did not discuss any particular contextual factors in holding that the newsletter was express advocacy. *See MCFL*, 479 U.S. at 249–50. Also of significance is the Court's indication in another case that timing the political advocacy of a "no" vote on a controversial referendum to occur "in the heat" of the vote "only strengthens the protection afforded" by the First Amendment to the advocacy. *McIntyre*, 514 U.S. at 347.

[19] On federal questions, this court is bound only by the decisions of the United States Supreme Court. *Thompson v. Village of Hales Corners*, 115 Wis. 2d 289, 307, 340 N.W.2d 704 (1983) (citing *United States ex rel. Lawrence v. Woods*, 432 F.2d

670

contained explicit words "advocating the election or defeat of a clearly identified candidate," the ads would be express advocacy subject to ch. 11 regulation, pursuant to the rule of *Buckley* and *MCFL*.

¶ 26. However, the Board does not assert that WMC's advertisements include any "magic words." Likewise, the Board does not point to any specific words or phrases in the advertisements which might qualify as explicit words which advocate the election or defeat of a clearly identified candidate.[20] To get around this, the Board urges us to find that WMC's advertisements are express advocacy based upon the context in which they were broadcast. The Board argues that we should evaluate communications on a case-by-case basis, labeling a communication express advocacy whenever its context suggests that it is "unambiguously related to the campaign of a particular. . .candidate." *Buckley*, 424 U.S. at 80. Among the factors the Board contends that we should consider are the proximity in time of the communication to an election, the underlying intent of the communication, the effect of the communication, the

1072, 1075–76 (7th Cir. 1970)). The value of the opinions of federal courts of appeals and district courts is limited to their persuasiveness. *See id.*

[20] Unlike the newsletter in *MCFL*, the advertisements in this case contain no explicit references to an election, no express language suggesting that viewers or listeners should vote in a particular way, and no wording identifying the featured incumbent legislators as candidates in the November election. *See MCFL*, 479 U.S. at 243. We point out this distinction only for purposes of clarifying the basis of the Board's argument. For the reasons made clear in the text, we do not find it necessary to determine whether WMC's advertisements qualify as express advocacy.

audience, and the proximity of the geographical area in which the communication is disseminated to the voting district of the featured candidate.[21]

---

[21] Despite the position to the contrary taken by the dissent, it appears to us to be beyond dispute that the central premise of the Board's position was that this court should adopt a context-based definition of express advocacy. One need only glance at the following examples from the Board's briefs in order to grasp the Board's clear argument in favor of a standard based on context:

> Not only must the analysis include the character and unambiguity of the words, but the context within which the words are spoken. Justice Holmes noted in his opinion in *Schenck v. United States*, 249 U.S. 47 (1919), that "the character of every act depends upon the circumstances in which it is done." *Schenck*, 249 U.S. at 52. In *Schenck* the court did not ignore the fact that "in many places and in ordinary times" the defendants' circulating pamphlets which argued against conscription in the United States Army during the first World War and urged the readers to assert their rights under the Constitution and told them "[y]ou must do your share to maintain, support and uphold the rights of the people of this country" would have been within their constitutional rights. *Id.*

> The court's earlier decisions on First Amendment speech issues, and the *Buckley* decision itself, affirm what every speaker or listener knows: the meaning of speech cannot be determined without at least considering its immediate context, e.g., whether the theater was empty or crowded when the speaker yelled "fire." *See Schenck*, 249 U.S. at 52.

Board's Br. at 15–16.

> The state submits, however, that it is permissible in this case, as with other First Amendment standards, to look at the context in which the speech was made. Looking at context does not mean changing the standard to a subjective standard or inappropriately examining intentions or motives as respondents suggest. (Respondents' brief at 23–24.) Context is time, place and audience and is often relevant in examining First Amendment speech.

Board's Reply at 7.

¶ 27. It may well be appropriate to consider context in determining whether a communication constitutes express advocacy. It should be remembered

> This court should consider context by examining the effect particular speech has on its audience given the particular time and place.
>
> Consideration of the context of speech is acceptable in other First Amendment venues. The doctrines of subversive speech, "fighting words[,"] libel, and speech in the workplace and in public fora illustrate that when and where speech takes place can determine its legal significance. In these instances, context is one of the crucial factors making these kinds of speech regulatable [sic]. First Amendment doctrine has long recognized that words take part of their meaning and effect from the environment in which they are spoken. See *Furgatch*, 807 F.2d at 863.
>
> While the *Furgatch* court concluded that the weight given to the context of speech may be lessened when the constitutional standard is express advocacy, it recognized that context is relevant to a determination of express advocacy.

Board's Reply at 8. At oral argument, the Board shifted its position slightly, but continued to argue for a context-oriented standard of express advocacy:

> There is nothing in the U.S. Supreme Court that says express advocacy is the opposite of implied advocacy or express advocacy is the opposite of an issue ad. What we have to do is read these ads as a whole, look at their essential nature, look at their entire content, and decide whether they unambiguously relate to the campaign of a particular candidate. . . .
>
> I don't think there's any authority that prevents us from looking at context; in fact, on the contrary, there's a long line of U.S. Supreme Court cases that suggests what every school child knows: whether you say "fire" in an empty theater or a crowded theater makes a significant difference. If we make a very limited reference to context in this case, and I submit time, place, and audience is the context, then it clearly affirms our—our—the clear answer that these are express advocacy ads. The ads were aired shortly before the election, they were aired in a geographical area in which each of the targeted candidates were running and they were aired to an audience of voters who were about to vote for those candidates. . . .
>
> I think in determining whether an ad is unambiguously related to a campaign, a court may make a limited consideration of time, place

that *Buckley* developed its definition of express advocacy while interpreting a specific federal statute. In

> and audience. I am not suggesting to you that context is a replacement for the *Buckley* standard. . . .
>
> I would say the standard is what the *Buckley* court stated, that it is spending that is unambiguously related to the campaign of a particular federal candidate. I would then go on to say that in determining—making that determination, certain factors can be considered, and I would draw from the language of the *MCFL* case and the *Furgatch* decision. . . .

During oral argument in this court, Justice Bradley, the author of the dissent, characterized the Board's argument as one requiring a review of the context of each individual ad. Justice Bradley commented to counsel for the Board:

> There's something to be said about bright-line tests if we're dealing with large number—volumes. People have to have notice of what's expected in order to proceed. *Your proposal talks about, "Let's look at the essential nature of each individual ad and review it in the context."* Well, you know, that's one of those things that, after the fact, you might know if you've made a—have a problem earlier on. What kind of definition or contour are you proposing that is akin to a bright line so that people can have notice of what's expected and not expected, rather than, "Let's take a look at each one individually?"

(Emphasis added.) Counsel for the Board replied, "I understand your question and much is to be said for a bright-line test in that it's more convenient—it's simpler, it's easier to follow. I submit to you that there are other constitutional standards such as obscenity and minimum contacts that are not precisely defined, that we are often in constitutional law asking courts to interpret, we are asking courts to exercise judgment, and I think that is precisely why the U.S. Supreme Court put the examples in a footnote. . . ."

We also note that the circuit court determined that the Board was attempting to apply the five-factor *Crawford* test for "political purpose" in this case. The Board claims in its brief in this court that it never argued that the five *Crawford* criteria should be used in determining whether the ads were express

*FEC v. Furgatch*, 807 F.2d 857, 863 (9th Cir. 1987), *cert. denied*, 484 U.S. 850 (1987), the Ninth Circuit adopted a broader definition of express advocacy when it held that context is relevant in determining whether a political communication is express advocacy. The *Furgatch* court took the following approach, which presents an attractive alternative:

> We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible to no other reasonable interpretation but as an exhortation to vote for or against a specific candidate.

*Furgatch*, 807 F.2d at 864. The court explained that under this standard, the message of the speech must be "unmistakable and unambiguous, suggestive of only one plausible meaning," it must "present[ ] a clear plea for action," and it "must be clear what action is advocated." *Id.* Context remains an "ancillary" consideration, the court stated, one "peripheral to the words themselves." *Id.* at 863. The court specifically relied on the timing of an advertisement (within one week of the election) in concluding that the ad was express advocacy. *Id.* at 865.

¶ 28. It should be noted, however, that *Furgatch* makes no mention of the United States Supreme Court's decision in *MCFL*, even though *MCFL* preceded *Furgatch* by nearly one month. *See FEC v. Christian Action Network, Inc.*, 110 F.3d 1049, 1053 n.4

---

advocacy. In any event, we are thoroughly satisfied that in this court, the Board argued in favor of a context-based standard unrelated to the five-factor test of *Crawford*. *See Crawford*, 123 Wis. 2d at 183.

(4th Cir. 1997). It is also significant that at least two courts have held that an FEC regulation adopting the context-based rule of *Furgatch* is an invalid attempt to regulate issue advocacy.[22] *See Right to Life of Dutchess County, Inc. v. FEC*, 6 F. Supp. 2d 248, 249–50, 253–54 (S.D.N.Y. 1998); *Maine Right to Life Comm. v. FEC*, 914 F. Supp. 13 (D. Me. 1996), *aff'd per curiam*, 98 F.3d 1 (1st Cir. 1996), *cert. denied*, 118 S. Ct. 52 (1997). Other courts have rejected similar attempts to broaden the definition of express advocacy. *See, e.g., Faucher v. FEC*, 928 F.2d 468, 471–72 (1st Cir. 1991), *cert. denied* 502 U.S. 820 (1991); *FEC v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 53 (2nd Cir. 1980)(*en banc*); *FEC v. Christian Action Network*, 894 F. Supp. 946, 958 (W.D. Va. 1995), *aff'd per curiam*, 92 F.3d 1178 (4th Cir. 1996).

¶ 29. Regardless of whether it might be permissible to consider context in defining express advocacy, we conclude, for the reasons which follow, that WMC had insufficient warning before broadcasting its advertisements that a context-based standard could be used to determine that the ads were express advocacy which would subject WMC to regulation under the Wis. Stat. ch. 11 provisions at issue.

¶ 30. "Because we assume that [persons are] free to steer between lawful and unlawful conduct, we insist

_____

[22] Courts have deemed it "obvious" that 11 C.F.R. § 100.22 (b) "comes directly from" the language of *FEC v. Furgatch*, 807 F.2d 857, 863 (9th Cir. 1987), *cert. denied*, 484 U.S. 850 (1987). *Maine Right to Life Comm.*, 914 F. Supp. at 11. *See also Kansans for Life, Inc. v. Gaede*, 38 F. Supp. 2d 928, 937 (D. Kan. 1999). The FEC regulations provide that a communication is express advocacy if it either meets the *Furgatch*-based test of § 100.22(b) or contains explicit language of advocacy. *See* 11 C.F.R. § 100.22 (1999).

that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Such notice is a basic requirement of due process. *Grayned,* 408 U.S. at 108. When First Amendment interests are implicated by laws which may result in criminal penalties,[23] imprecise standards "may not only 'trap the innocent by not providing fair warning' or foster 'arbitrary and discriminatory application' but also operate to inhibit protected expression by inducing 'citizens to steer far wider of the unlawful zone. . .than if the boundaries of the forbidden areas were clearly marked.' " *Buckley*, 424 U.S. at 41 n.48 (quoting *Grayned,* 408 U.S. at 108–109). *See also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Speiser v. Randall*, 357 U.S. 513, 526 (1958). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Buckley*, 424 U.S. at 41 n.48 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

¶ 31. The Board's attempt to apply a context-based standard to the ads involved in this case amounts to an after-the-fact effort to create a standard of express advocacy which is broader than the standard existing in Wisconsin when WMC ran its ads.[24] Unlike

---

[23] Criminal penalties may result from intentional violations of Wis. Stat. ch. 11, although the Board did not opt to seek such penalties in this case. *See* Wis. Stat. § 11.61(1).

[24] We find it interesting that the Board's Executive Director did not apply a context-based standard in evaluating transcripts of WMC's ads prior to their broadcast. In response to a request by counsel for IMC, the Executive Director, in an October 2, 1996, letter, stated unequivocally, "It is the opinion of the Elections Board staff that these communications are not subject

the Board, the FEC has promulgated and published its interpretation of the statutory term express advocacy, which includes a context-based test, as an administrative rule.[25] By creating and attempting to apply its

to regulation under Wisconsin's campaign disclosure law." Respondents' App. at 50; R. 15 at 4. The Executive Director's opinion followed a detailed analysis of the wording of the advertisements, with no consideration of context-oriented factors. The letter only briefly mentioned that "[t]he timing of the broadcast of the ads, in the midst of a political campaign, could raise the suggestion that these are essentially candidate advocacy ads." *Id.*

The circuit court apparently opted to treat WMC's motion as a straight motion to dismiss rather than a motion for summary judgment, and therefore, did not consider this letter. The letter was referred to by counsel in briefs and oral argument in this court. We mention it only as background material.

[25] The FEC rule provides:

§ 100.22 Expressly advocating (2 U.S.C. 431 (17)).

Expressly advocating means any communication that—

(a) Uses phrases such as "vote for the President," "re-elect your Congressman," "support the Democratic nominee," "cast your ballot for the Republican challenger for U.S. Senate in Georgia," "Smith for Congress," "Bill McKay in '94," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidate(s), "reject the incumbent," or communications of campaign slogan(s) or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say "Nixon's the One," "Carter '76," "Reagan/Bush" or "Mondale!"; or

(b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—

new, context-oriented interpretation of the statutory term express advocacy, the Board has, in effect, engaged in retroactive rule-making. *See* Wis. Stat. §§ 227.01(13), 227.10(1); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988) (stating, "Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant"). *See also Schoolway Transp. Co. v. DMV*, 72 Wis. 2d 223, 236–37, 240 N.W.2d 403 (1976); *Frankenthal v. Wisconsin R.E. Brokers' Bd.*, 3 Wis. 2d 249, 253–54, 88 N.W.2d 352 (1958), *on motion for reh'g*, 3 Wis. 2d 257a, 257b–257c, 89 N.W.2d 825 (1958). We agree with the circuit court that it would be "profoundly unfair to apply a previously unarticulated test, retroactively, to these defendants." Decision and Order at 25.

¶ 32. The United States Supreme Court has held that a deprivation of the due process right of fair warning can occur not only from vague statutory language,

(1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

(2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

11 C.F.R. § 100.22. The Wisconsin Elections Board has never promulgated any comparable rule setting forth its interpretation of "express advocacy" as that term is used in the Wisconsin Statutes. As stated in footnote 10 of this opinion, Wis. Admin. Code ElBd § 1.28 (Apr., 1998), refers to express advocacy but does not attempt, in any way, to define it.

As we noted earlier (see footnote 22), the language of 11 C.F.R. § 100.22(b) comes from the language of *FEC v. Furgatch*, 807 F.2d 857, 863 (9th Cir. 1987), *cert. denied*, 484 U.S. 850 (1987). Subsection (a) of that same regulation is clearly from *Buckley*. *See, Buckley*, 424 U.S. at 80 n.52.

679

but also from unforeseeable and retroactive interpretation of that statutory language. *See Bouie v. City of Columbia,* 378 U.S. 347, 352, 355 (1964). The Court indicated that a due process violation resulting from retroactive interpretation of statutory language is actually worse than a vague statute because it "lulls the potential defendant into a false sense of security, giving him no reason even to suspect" that he might be subject to the statutory prohibition. *Id.* at 352.

¶ 33. Further, we decline the Board's invitation to craft a new standard of express advocacy for the state of Wisconsin. The creation of such a standard is properly the role of the legislature and the Board, not this court.[26] *See Wagner Mobil, Inc. v. City of Madison,* 190 Wis. 2d 585, 594 n.4, 527 N.W.2d 301 (1995)(recognizing the well-established principle that the Wisconsin Constitution requires "the separation of the legislative and judicial powers.") *See also* Wis. Stat.

---

[26] The dissent argues that *Buckley* obligates this court to supply a definition for the term "express advocacy" in Wis. Stat. § 11.01(16)(a)1 to save the statute from invalidation on grounds of vagueness. This argument misinterprets the question before us. We are not faced with the question of whether the language concerning express advocacy in Wis. Stat. § 11.01(16)(a)1 and Wis. Admin. Code ElBd § 1.28 (Apr., 1998) is unconstitutionally vague. These statutory and code sections parrot the language used in *Buckley.* As we have already explained, express advocacy has been defined in both *Buckley* and *MCFL. See MCFL,* 479 U.S. at 249; *Buckley,* 424 U.S. at 44 & n.52, 80 & n.108. In contrast, the problem in this case is that the Board is attempting to retrospectively apply to the respondents a context-oriented standard of express advocacy which has heretofore been unknown in Wisconsin law. We are under no obligation to adopt such a standard, where the lack of fair warning and, in effect, retroactive rulemaking amount to a violation of due process, and are determinative of the issue presented.

§ 5.05(1)(f). The level of regulation desirable in this area depends upon public policy considerations more appropriately explored in a forum other than this court. We have described our role in areas "peppered with political perceptions and emotionally laden views," as one restricted to interpreting the scope of constitutional requirements. *Kukor v. Grover*, 148 Wis. 2d 469, 504–505, 436 N.W.2d 568 (1989).

¶ 34. We conclude that under the circumstances of this case, WMC, when it broadcast its advertisements, had insufficient warning that the ads could qualify as express advocacy under Wisconsin's campaign finance law. The Board's after-the-fact attempt to apply a context-oriented standard of express advocacy must fail, since, in effect, it was an unfair attempt[27] at retroactive rule-making, without any express statutory grant of authority, and thus, a violation of due process. Because this conclusion prevents the Board from prevailing in this action under any factual conditions, we affirm the circuit court's dismissal of the Board's complaint.

### III.

¶ 35. Based on our conclusion that the Board may not regulate WMC under the campaign finance laws in ch. 11 on the basis of the retrospective application of a context-based standard of express advocacy, we affirm the circuit court's dismissal of the Board's complaint. We stress that this holding places no

---

[27] "[T]he concern of due process is fundamental fairness." *State ex rel. Lyons v. De Valk*, 47 Wis. 2d 200, 205, 177 N.W.2d 106 (1970). *See In re D.H.*, 76 Wis. 2d 286, 296–97, 251 N.W.2d 196 (1977)(quoting *McKeiver v. Pennsylvania*, 403 U.S. 528, 543 (1971)); U.S. Const. amend. XIV; Wis. Const. art. I, § 1.

restraints on the ability of the legislature and the Board to define further a constitutional standard of express advocacy to be prospectively applied. We encourage them to do so, as we are well aware of the types of compelling state interests which may justify some very limited restrictions on First and Fourteenth Amendment rights. *See Gard v. State Elections Bd.*, 156 Wis. 2d 28, 36, 51–52, 65, 456 N.W.2d 809 (1990), *cert. denied*, 498 U.S. 982 (1990) (upholding a contribution limit which was found by this court to be narrowly tailored to serve the compelling state interest in preventing actual or apparent corruption of the political process). *See also Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–60 (1990); *NCPAC*, 470 U.S. at 496–97; *FEC v. National Right to Work Comm.*, 459 U.S. 197, 207–208 (1982); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788–89 (1978). Consistent with this opinion, we note that any definition of express advocacy must comport with the requirements of *Buckley* and *MCFL* and may encompass more than the specific list of "magic words" in *Buckley* footnote 52, but must, however, be "limited to communications that include explicit words of advocacy of election or defeat of a candidate."[28]

*By the Court.*—The judgment and order of the circuit court is affirmed.

¶ 36. JON P. WILCOX, J., did not participate.

---

[28] *Buckley*, 424 U.S. at 43. The United States Supreme Court, as noted previously, required that the candidate must be "a clearly identified" one. *Id.* at 80. In regard to the requirement of explicit language, we are mindful that words in one context may take on different meaning in another. We recognize that a number of courts have rejected a context-based approach, finding that it did not comport with the holdings in *Buckley* and *MCFL*. (See footnote 18 and paragraph 28 herein.)

¶ 37. WILLIAM A. BABLITCH, J. (*concurring*). Nobody, including the Elections Board, is attempting to stop WMC from saying anything they want to say during the election season. What is at stake here is whether the public has a right to know who is paying for whatever it is WMC wants to say during the election season.

¶ 38. The spin surrounding this case has been that the Elections Board is trying to stifle free speech. Not true. It's all about the public knowing who is saying what.

¶ 39. An informed electorate is essential to a healthy democracy. If people are told that a Ford is a great car, it is important for people to know whether Consumer Reports or Ford is saying so. Similarly, if the electorate is being told that a candidate is a great friend of education, it is important for people to know whether the teachers union or Common Cause is saying so. The answer to "Who paid?" answers a lot of questions.

¶ 40. That is what is at stake here, and no amount of spin should be able to hide that fact.

¶ 41. Having said the above, I join the majority opinion. I agree that WMC should be dismissed from the case for lack of notice regarding what constitutes "express advocacy." I would have preferred that a majority could have found its way to expressing a standard by declaring that, in the future, ads such as these constitute "express advocacy." I would have joined that result.

¶ 42. Nevertheless, a half loaf in this instance is far better than no loaf at all. The dissent presents a well reasoned and persuasive case as to why these ads constitute "express advocacy." Does the dissent express

683

an acceptable standard? For me, yes. Are there the votes for it? No.

¶ 43. If I joined the dissent, the result would be a 3–3 vote. Guidance is needed and a tie vote does not provide guidance. A tie vote results in no opinion and therefore no standard or guidance from this court on the very issue that needs resolution. Because there is at present no appellate decision on the issue, we would have to remand to the court of appeals for their decision, then consider yet another appeal. Meanwhile, at least one or more election cycles would come and go. Wisconsin would continue to have no standard as to what constitutes "express advocacy." The legislature and the Elections Board, as well as potential advocates such as the Wisconsin Manufacturers Association, would be left completely in the dark as to whether ads that do not contain any "magic words" can be regulated. Drafters of a standard would not know whether they should even consider a context based approach.

¶ 44. The majority opinion, despite the words of the dissent, does provide some needed guidance. It does not provide all the guidance the dissent wants, but in this instance some guidance is better than none.[1]

---

[1] I would have preferred a decision that more closely echoed the dissent in some respects, but that it is not to say that the majority opinion voices a decision with which I disagree. It is of utmost importance to provide guidance in this case, which the majority does effectively, and does correctly. That is why I join it. It does not go as far as I would prefer, but most judges have joined opinions that go a bit farther or less far than we would like. See Brown v. Board of Education, 347 U.S. 483 (1954). See also Daniel A. Farber, et al., Constitutional Law: Themes from the Constitution's Third Century 50–52 (1993); Leo Katcher, Earl Warren, A Political Biography (1967).

¶ 45. By my joining the majority, the legislature or the elections board is now free to craft a standard for "express advocacy," knowing that at the least there is no requirement for "magic words," and that the court will consider as an alternative a context based approach. I invite one or the other or both to craft a standard. . .posthaste.

¶ 46. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). The First Amendment is not what it used to be. It is fashionable today to protect deviant speech[1] and expressive conduct.[2] But pure speech which discusses public issues and public officials is vulnerable to the impulse for government regulation. While I join that part of the court's decision dismissing the suit against the respondents, I dissent from much in the majority opinion.

¶ 47. Little is made of the fact that the respondents in this case went to the State Elections Board for

---

Judicial decision-making necessarily involves a variety of choices. Would that the best choice be always clear, but it is not. Some choices may, at first blush, appear to be preferable, but, looked at it in the perspective of the whole, are not. That is what happened here. I compromised. Most appellate judges do. Sometimes the best choice, for a variety of reasons, is not one's first choice.

Judicial opinions are filled with compromise, and we should not deny it. As Benjamin Cardozo said, judges "do not stand aloof on chill and distant heights; and we shall not help the cause of truth by acting and speaking as if they do."

[1] *See State v. Zarnke,* 224 Wis. 2d 116, 589 N.W.2d 370 (1999).

[2] *See Lounge Management v. Town of Trenton,* 219 Wis. 2d 13, 580 N.W.2d 156 (1998); *State v. Janssen,* 219 Wis. 2d 362, 580 N.W.2d 260 (1998).

guidance before broadcasting their ads. Majority op. at 677, n.24. Only after they received government acquiescence did they go forward. Thereafter, several circuit courts enjoined the broadcast of these pure speech ads while the ads were on the air. Then the Elections Board reversed its position and tried to compel the filing of various reports.

¶ 48. The present case is a new episode in this saga. The majority opinion appears to encourage government rule-making to extend the boundaries of "express advocacy." Rule-makers are encouraged to march through the quicksand of "context" en route to a more correct and perfect political order. The dissent can't wait for others to act; it wants the court to impose its own rules here and now. Both opinions soar into pronouncements about speech regulation after a clear majority of this court decided that we have no viable case before us.

¶ 49. Wisconsin Statutes regulating political expression must be very narrowly construed. 65 O.A.G. 145 (1976). If the term "express advocacy" encompasses more than the magic words enumerated in footnote 52 of *Buckley v. Valeo*, 424 U.S. 1, 44 (1976) (per curiam), the additional words and phrases should be explicitly disclosed. Those words and phrases must advocate the election or defeat of a clearly identified candidate by urging citizens how to vote or directing them to take other specific action unambiguously related to an election.

¶ 50. The First Amendment is inconsistent with rules that leave people in doubt whether their expression is regulated. It does not countenance enforcement against speech on a case by case basis where government regulators are permitted to draw inferences from circumstances or guess about people's motives.

¶ 51. It is probably ill-advised to make any comment about "express advocacy" in this case because it really amounts to an advisory opinion.

¶ 52. ANN WALSH BRADLEY, J. (*dissenting*). The majority cannot have it both ways: it cannot both uphold the law while at the same time decline to enforce it. Either it must acknowledge and apply the standards already established by the only two United States Supreme Court cases that have addressed express advocacy or, if that standard is unclear, it must do the business of a court and articulate a constitutional standard. Because I believe that it should do the former, and in the end it dodges the issue accomplishing neither, I respectfully dissent.

¶ 53. At the outset I want to note my agreement with the majority. Like the majority, I agree that no particular magic words are necessary for a communication to constitute express advocacy. Majority op. at 669. Like the majority, I agree that the contextual setting may assist in the consideration of whether an ad is express advocacy. *Id.* at 654, 673–75. Like the majority, I agree that *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), and *FEC v. Massachusetts Citizens for Life, Inc. (MCFL)*, 479 U.S. 238 (1986), constitute the only authority which binds Wisconsin courts on the issue. Majority op. at 670. The majority and I part company, however, when it declines to acknowledge and apply the already established definition of express advocacy.

I.

¶ 54. In dodging the issue and relegating the task of defining express advocacy to the legislature or Elections Board, the majority charts a solitary course.

687

It appears to be the only court in the nation that requires the legislature or administrative agency to take the lead in adding further definition to express advocacy. Other courts have seen fit to tackle the express advocacy issue that the majority sweeps aside even though the statutes those courts were interpreting did not have a codified definition before them. *See, e.g.; Faucher v. FEC*, 928 F.2d 468, 471 (1st Cir. 1991); *FEC v. Furgatch*, 807 F.2d 857, 859–60 (9th Cir. 1987); *FEC v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45, 52–53 (2nd Cir. 1980) (en banc); *FEC v. NOW*, 713 F. Supp. 428, 433–34 (D.C. Cir. 1989).

¶ 55. Examining the contours of the High Court's definition of express advocacy is quintessentially a constitutional inquiry. Constitutional inquiries are ultimately the business of courts. Thus, I find it difficult to understand why the majority washes its hands of the matter.

¶ 56. The majority's error is further illustrated by its laudatory comments of the Federal Election Commission (FEC) rule-making process. It sees fit to hold up for high praise the FEC's adoption of a definition for express advocacy, while at the same time castigating the inaction of the Elections Board. Majority op. at 677–79.

¶ 57. However, the majority fails to recognize that the FEC rule is not the product of that agency's creative juices but is little more than permissible plagiarism of various court decisions: subsection (a) is taken from *Buckley*, 424 U.S. at 43–44, 79–80; subsection (b) is taken from *Furgatch*, 807 F.2d at 864. *See Maine Right to Life Committee v. FEC*, 914 F. Supp. 8, 11 (D. Me. 1996). Had these other courts traveled the path of the majority, the FEC rule that the majority finds so

noteworthy would not have come into existence. The FEC rule followed court decisions and is based on those decisions. The courts lead and the agency rules follow. The majority errs when it reverses the equation and relegates its business to others.

¶ 58. If, however, the majority really believes that it could not apply the term express advocacy as found in Wis. Stat. § 11.01(16)(a)1, or in Wis. Admin. Code ElBd § 1.28 (Apr. 1998), because those provisions are too imprecise to give notice, then the majority should find that enforcement would be a denial of due process because they are unconstitutionally vague. Instead, the majority takes the tack of mischaracterizing the Board's position and based on that mischaracterization dismisses the complaint finding a denial of the due process right of fair warning.

¶ 59. The majority opinion's conclusion that the complaint should be dismissed is based on a faulty foundation. It is built on the premise that the Board's definition of express advocacy is context based. It needs this premise in order to arrive at its conclusion. Such a foundation, however, mischaracterizes the Board's position.

¶ 60. The majority ignores the repeated statements of the Board that its position adopts the *Buckley* definition as applied by *MCFL* and that only as a fall back position does the Board address a context-based definition. Instead, the majority selects excerpts from the briefs and oral arguments that advance only the fall back position and then concludes based on those excerpts that the Board is attempting to apply an after-the-fact context-oriented standard. Majority op. at 677.

¶ 61. This flies in the face of the actual position the Board advanced in its brief and at oral argument. In its brief the Board takes the position that the defini-

tion of express advocacy has been established by the United States Supreme Court and no further definition or explanation of the standard is required. All that the court is required to do is apply that definition to the advertisements at issue in this case. State's br. at 9.

¶ 62. Similarly, at oral argument the Board repeatedly stated the position that sufficient definition of the standard could be found by applying the already established Supreme Court's definition of express advocacy. It argued that there was no need to apply a context-based definition.

¶ 63. In arriving at its misguided conclusion, the majority must, and does, ignore the following exchange and repeated statements of the Board setting forth its primary position.

> JUSTICE CROOKS: What's the test in your opinion?
>
> ATTORNEY FOR THE BOARD: The test that I'm suggesting is the *Buckley* test. The *Buckley* court sets forth express advocacy and it explains express advocacy by saying it's precisely related to the spending that is unambiguously related to the campaign of a particular candidate.
>
> JUSTICE CROOKS: Doesn't it also say expressly advocates a particular election result?
>
> ATTORNEY FOR THE BOARD: Right and in discussing what express advocacy means, it says, "This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular candidate." That's at page 80. I think in determining whether an ad is unambiguously related to a campaign, a court may make a limited consideration of time, place and audience. I am not suggesting to you that context is a replacement for

the *Buckley* standard. I'm not asking you to apply anything but the *Buckley* express advocacy standard.

And the Board's attorney again stated:

I submit that the content of these ads by themselves are express advocacy. It is not necessary for us to make limited reference to external events. . . .

And repeated:

I think, and I want to be very clear about this. These ads are express advocacy in and of themselves. . . . They are express advocacy regardless of when they are run. . . .

And repeated:

I don't think it's important to draw a line because I'm not suggesting to you that context is the test. . . .

And repeated:

The *Buckley* standard prevails; the *Buckley* standard is express advocacy. We are not asking you to change that standard. . . .

And repeated:

[This court] has to use the language in *Buckley* and the language in *MCFL* and apply the express advocacy standard. . . .

¶ 64. Contrary to the repeated requests of the Board, the majority prefers to wait for the legislature or the Elections Board to craft a definition of express advocacy. That has already been done sufficiently by the United States Supreme Court. If the majority finds that definition wanting for specificity, then it should not relegate the task of further definition to some other

entity. Crafting a definition is the business of this court. Whatever it chooses to do, it most certainly should not attempt to cloak its inaction with a pervasive mischaracterization of the Elections Board's argument.

## II.

¶ 65. Unlike the majority, I would address the issue rather than dodge it. There is no need to invite the legislature or the Elections Board to craft a new standard because the standard already exists. We need not rely on a "previously unarticulated test," majority op. at 679, or an "after-the-fact effort to create a standard of express advocacy," majority op. at 677. Rather, I would acknowledge and apply the already established standards of express advocacy set forth in *Buckley* and *MCFL*.

¶ 66. The *Buckley* Court concluded that government could regulate the disclosure of contributors when the spending is used for communications "that expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80. The Court then precisely defined the express advocacy test as follows:

> This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular. . .candidate. . . .*Id.* at 80.

¶ 67. *Buckley*, of course, was a facial challenge to the Federal Election Campaign Act (FECA) so the Court did not have occasion to apply its test for express advocacy at that time. However, in *MCFL* the Court was faced with, to date, its sole opportunity to do just that.

¶ 68. In *MCFL*, a group incorporated to "foster respect for human life and to defend the right to life of all human beings, born and unborn" produced a "Special Edition" of its newsletter setting forth "everything you need to know to vote pro-life" in the upcoming November elections. *MCFL*, 479 U.S. at 241, 243. Though its usual newsletter was sent to approximately 3,000 persons, MCFL printed over 100,000 copies of the "Special Edition."

¶ 69. The newsletter listed the candidates for each federal and state office in every voting district in Massachusetts and indicated whether that candidate's position on three issues corresponded with that of MCFL. *Id.* at 243. While over 400 candidates were listed, only 13 had their picture included in the "Special Edition" and all 13 were candidates whose positions aligned entirely with that of MCFL on the issues listed.

¶ 70. The Court determined that the "Special Edition" was express advocacy. In doing so, the Court first noted that in *Buckley* the Court had "concluded. . .that a finding of 'express advocacy' depended upon the use of language such as 'vote for,' 'elect,' 'support,' etc." *MCFL*, 479 U.S. at 249. The Court then stated that the "Special Edition" included "[j]ust such an exhortation." *Id.*

> The publication not only urges voters to vote for "pro-life" candidates, but also identifies and provides photographs of specific candidates fitting that description. The Edition cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it provides *in effect* an explicit directive: vote for these (named) candidates. *The fact that this message is marginally less direct than "Vote for Smith" does not change its essential nature. Id.* (emphasis added).

693

¶ 71. Were *Buckley* the Supreme Court's only statement on the matter, I might be more inclined to agree with those courts that have concluded that express advocacy requires the "magic words" appearing in the opinion or their synonyms. However, to read *MCFL* and to see how the High Court actually applied the *Buckley* test, I do not believe that the test is so limited in delineating what types of speech constitute express advocacy.

¶ 72. If the *MCFL* Court had seen fit to restrict the appropriate inquiry into only the words of the "Special Edition" it would have limited its discussion to the "dangerous" language of the flyer: "Everything you need to know to vote pro-life," "Vote Pro-Life," and "No pro-life candidate can win in November without your vote in September." *MCFL*, 479 U.S. at 243. However, the Court did not. *Id.* at 249.

¶ 73. Instead, the Court noted that the flyer contained more than merely words. As part of its message it contained photographs of certain pro-life candidates. *Id.* The Court determined that the *Buckley* express advocacy test is not restricted to a list of possible examples set forth in a footnote. Rather, the *Buckley* express advocacy test looks to the essence of the advertisement's purpose.

¶ 74. In applying the test the Court focused on the "essential nature" of the flyer. It noted that the flyer could not reasonably be regarded as a "mere discussion of public issues" that necessarily "raise[s] the names of certain politicians." *Id.* The Court noted that the flyer "in effect" provided the "explicit directive" to "vote for these (named) candidates." *Id.* Finally, the Court noted that even if the flyer's message was "marginally less direct than 'Vote for Smith' " its "essential nature" constituted express advocacy.

¶ 75. In light of these writings, I cannot conclude that the Supreme Court intended express advocacy to be limited exclusively to a narrow band of exhortative words. Instead based on the *MCFL* discussion, we are to look at the "essential nature" of the advertisement: Is it one that merely discusses issues, and in the process discusses candidates inextricably linked to those issues, or is it one that advocates some action for or against a candidate but does so under the guise of discussing issues? Ultimately, the question is whether the advertisement is unambiguously advocating the election or defeat of a named candidate. *Buckley*, 424 U.S. at 80.

¶ 76. This approach, labeling advertisements as express advocacy when their essential nature unmistakably advocates for the election or defeat of a candidate, is more congruous with the realities of both advertising and speech. The accuracy of this statement is reinforced with even the most superficial observations of advertising in general. Few advertisements will directly say "Buy Nike rather than Reebok" or "Drink Maxwell House coffee." Be they in the print or electronic media, advertisements normally do not include a call for action or use "magic words" to relay their message. Yet every reader, listener, or viewer knows that "Less filling, tastes great" is an unambiguous exhortation to purchase a particular type of Miller beer, and "They're Gr-r-reat!" is Tony the Tiger's unambiguous appeal to buy a box of sugar-coated corn flakes.

¶ 77. The approach delineated by the Supreme Court does not stand for semantic shrewdness. Rather, its approach is to look at the essential nature of the advertisement. Such an approach does not open Pandora's box either, for it only applies to those

695

advertisements susceptible to no other reasonable interpretation than advocating the election or defeat of a candidate. This does not encompass every attempt at influencing the issues of debate through issue advertisements. It only recognizes that those advertisements' essential natures must be on issues, not on candidates.

¶ 78. Under such a standard, there can be no doubt that the advertisements at issue here are really "exhortation[s] to vote for or against. . .specific candidate[s]." The essential nature of these advertisements is candidate advocacy, not issue advocacy. These advertisements mention issues only as a vehicle of propping up or tearing down a particular candidate. Take away references to the candidates and precious little, if anything, would remain of the advertisement.

¶ 79. These advertisements are about vilifying or venerating a candidate; they are not about issues. There is a picture of a candidate and a name of a candidate that predominates each advertisement. Consider, for example, the following advertisement sponsored by WMC:

> This year, Wisconsin homeowners received their property taxes cut by almost 17%. No thanks to Senator Alice Clausing. She voted against the largest property tax cut in Wisconsin history. Then Clausing voted against an additional 36 million dollars for schools—right in her own district. Alice Clausing. Liberal on Taxes. . .Wrong on education. Call Senator Clausing. Tell her to stop voting with those Madison liberals.

¶ 80. While issues such as taxes and education were discussed in the advertisement, they could not reasonably be considered the advertisement's essential

nature. Rather, the essential nature of this advertisement was a directive to the public to vote against Senator Clausing in the upcoming election. It unambiguously advocates the defeat of a named candidate. *See Buckley*, 424 U.S. at 80.

¶ 81. WMC also sponsored the following advertisement:

> What has Gary Drzewiecki done for Northeast Wisconsin? Homeowners will see their property taxes cut by an average of 11.5% Our children's schools will receive millions in additional state aid. And taxpayers will get spending controls on local government. Lower taxes, less spending, better schools. It's a record we can all be proud of. Call Gary Drzewiecki and tell him thanks.

Again taxes, education, and spending were issues mentioned in this advertisement. However, it is unreasonable to consider the essential nature of this ad to be anything other than express advocacy for the candidate. This was clearly not a "mere discussion of public issues" that necessarily "raise[d] the names of certain politicians." *MCFL*, 479 U.S. at 249. While a directive to call a candidate and thank him may be "marginally less direct than 'Vote for Smith,' " its essential nature is nonetheless express advocacy.

¶ 82. Finally I address the concurrence of Justice Bablitch. I am perplexed by the "half loaf is better than no loaf" analysis. I submit that whether we are left with a half loaf, a whole loaf, or no loaf at all should not drive our legal analysis and conclusions. Our job is to interpret and apply the law based on legal precedents, reason, and common sense. I agree with the concurrence as it addresses the essence of this case but disagree with its bottom-line approach.

697

¶ 83. Such an approach undermines rather than achieves the expressed goals of the concurrence. As noted at the outset the majority and dissent are in agreement that no particular magic words are necessary for a communication to constitute express advocacy, that the contextual setting may assist in the consideration of whether an ad is express advocacy, and that *Buckley* and *MCFL* constitute the only authority which binds Wisconsin courts on the issue.

¶ 84. We should decide those issues as to which we agree, acknowledge a divided court on the remaining issues, and remand the case to the court of appeals for a decision on the issues that divide us. The court of appeals may then apply the standard already defined by *Buckley* and *MCFL* and adopted by the majority. By joining the majority's mandate but endorsing the dissent's rationale, the concurrence effectively eliminates the possibility that the standard will ever be applied in this case.

¶ 85. Additionally, although the concurrence asserts that its decision is driven by a desire to get a speedy answer, the route that it has chosen will delay rather than achieve a prompt resolution. The concurrence invites the Elections Board or the legislature to establish rules, a time-consuming venture that they might not undertake. Most assuredly, any rules would be challenged and again the issue would end up before us to decide. The path espoused by the concurrence results only in further delay.

¶ 86. I end where I began. The majority errs in its attempt to have it both ways. It upholds the law but then turns around and declines to enforce it. It was required this day to choose which path it wished to follow: apply the express advocacy standard defined by the Supreme Court or, if that standard is too vague,

craft a better standard instead. It chose to do neither. I would have followed the Supreme Court's lead and assessed these advertisements under the essential nature standard of *Buckley* and *MCFL*. Because under such a standard these advertisements are express advocacy, I respectfully dissent.

¶ 87. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this opinion.